Jason Oric Williams was convicted of the capital murders of Gerald Paravicini, Freddie Barber, Linda Barber, and Bryan Barber, and the trial judge sentenced him to death, following the jury's recommendation of that sentence. We affirm both the convictions and his death sentence.
Although at trial Williams did not admit to the killings, he did not dispute the State's evidence that he killed Paravicini and the Barbers by shooting them with a .22 caliber *Page 1351 
rifle. Williams presented the defense of not guilty by reason of mental disease or defect; he alleged that his claimed mental defect was the consequence of his ingesting illegal drugs in the hours before the killings, coupled with a preexisting mental disorder. More specifically, Williams says his alleged mental defect is the product of a "borderline personality disorder"[1] and the ingestion of marijuana, LSD, crack cocaine, and an unidentified prescription drug, combined with alcohol, during the night and early morning hours before the killings. Williams's expert witness, psychiatrist Dr. Claude Brown, testified that, in his opinion, at the time of the killings Williams was suffering from a mental disease or defect and was not able to appreciate the wrongfulness of his acts. The State's rebuttal expert witness, psychologist Dr. Harry McClaren, testified that in his opinion Williams, at the time of the killings, had the ability to appreciate the consequences of his acts and was not suffering from a mental disease or defect. Thus, the major issue presented to the jury at trial was whether to accept Williams's defense of not guilty by reason of a mental disease or defect.
The Court of Criminal Appeals gave a lengthy and complete discussion of the facts of this case. See Williams v. State,710 So.2d 1276 (Ala.Crim.App. 1996). Thus, a more limited rendition of the facts is presented here. Williams, age 23, was divorced from Sandra Ellzey and had been living in the home of his friends Gerald and Clair Paravicini for the two weeks prior to February 15, 1992, the day of the killings. Williams and Ellzey had agreed to discuss possibly reuniting and had planned a date for Valentine's Day, February 14, 1992. Williams smoked marijuana before he met Ellzey for the evening. After meeting, they drove to a lounge, where he drank two or three beers. When Ellzey was ready to go home, Williams told her that he wanted to stay out longer and he asked her to drop him off at the Top Gun nightclub. He was to telephone her later when he wanted her to pick him up. At the club, Williams took two or more "hits" of LSD, smoked crack cocaine, ingested two pills of an unidentified drug, and drank a large amount of liquor. He never telephoned to ask Ellzey to pick him up.
At about 6:00 a.m. the next day, February 15, 1992, Williams arrived at the Paravicini home and was let in by Jeffery Carr, the minor son of Clair Paravicini. Williams telephoned Ellzey from the Paravicini home, and they argued about the fact that he had failed to call her the night before and that he had stayed out all night. During that conversation, Williams says, he began to have hallucinations, seeing a frightening figure in the room with him and Gerald Paravicini; however, Williams did not tell Ellzey he was seeing a frightening figure. Williams located a .22 caliber rifle in the home and shot Jeffery Carr in the face and in the arm. Jeffery ran to the neighboring home for help. Williams next shot Gerald Paravicini in the chest. Gerald also ran outside, where he died shortly thereafter. During this time Williams still was on the telephone with Ellzey, and Ellzey heard some of a conversation Williams had with Clair Paravicini.
Clair Paravicini was still in bed when she heard shouting and the shots. When she reached the living room, she found the front door open. She saw her son Jeffery running toward the neighbor's home, saw Williams standing outside with the rifle and a cordless telephone, and saw her husband Gerald standing nearby. Gerald told her to call for help, and she also ran for the neighbor's home. After reaching the neighbors and asking for help, Clair returned to try to help her husband. She went back inside the home to look for a towel to use to stop her husband's bleeding, and she found Williams inside. Williams asked her to give him the keys to the Paravicinis' truck so that he could drive Gerald to a hospital.[2] Clair, unable *Page 1352 
to locate the keys, asked Williams for her purse, which he had taken. Williams struck her in the face with the rifle and then left the house. Although the conversation between Ellzey and Williams had ended, during this time Ellzey heard some of the comments of Williams and Clair Paravicini, and she heard various noises in the background as she continued to stay on the line.
Williams ran out to the street and flagged down the driver of a pickup truck; Williams told the driver, Buford Billedeaua, that he had an emergency and that be needed his truck. Billedeaua, thinking Williams looked as if he was on drugs, turned off the truck engine, removed the keys, and then ran to the nearby woods. Williams shot twice at Billedeaua as he ran to the woods, but the shots missed.
Williams then ran down the street, past several houses, to the house occupied by the Barbers. Williams shot Linda Barber in the head as she answered the door. Williams then shot Linda's husband Fred Barber in the head as he sat at a kitchen table where he had been drinking coffee. Williams shot Fred and Linda's son Bryan in the head as he lay sleeping in bed. Williams broke into the room of another son, Brad; he shot Brad in the hand as he and Brad struggled for control of the rifle. Brad escaped. Williams then located the keys to the Barbers' van and drove away in it.
The day after the killings, Williams telephoned Ellzey from a truck stop in Mississippi. Ellzey testified that Williams was crying during the conversation, and she said he told her that he did not know what had happened, that he had a van and he did not know who it belonged to, and that he had blood on his clothing. She testified that she then told him about the people who had been killed and that he then became more upset. Williams surrendered to Mississippi State Police that day. After being advised of his Miranda rights, he gave a statement.
Williams was indicted on two counts of capital murder: (1) murder during a robbery, made capital by Ala. Code 1975, §13A-5-40(a)(2), and (2) murder of two or more persons in the same course of conduct, made capital by § 13A-5-40(a)(10). He was also indicted on two counts of attempted murder, the attempted murders of Jeffery Carr and Brad Barber. Williams pleaded not guilty and not guilty by reason of a mental disease or mental defect. The jury returned a guilty verdict on all counts and, by a vote of 10-2, recommended a sentence of death for the capital murder convictions. The trial judge imposed the recommended death sentence for the capital murder convictions and also sentenced Williams to 20 years' imprisonment for the attempted murder convictions.
Williams appealed his capital murder convictions and death sentence to the Court of Criminal Appeals, raising more than 50 issues. The Court of Criminal Appeals affirmed his convictions and sentence in a lengthy opinion, 710 So.2d 1276. Because of Williams's death sentence, we automatically granted his petition for a writ of certiorari to review his convictions and sentence. Rule 39(c), Ala.R.App.P.
Williams has raised 51 issues for our review; all were raised on appeal to the Court of Criminal Appeals and were discussed in that court's lengthy opinion. We have thoroughly reviewed all those issues. We have also carefully reviewed the record for "plain error," in accordance with Rule 39(k), Ala.R.App.P., and we have found none. We discuss here only the single issue that Williams's counsel addressed on oral argument before this Court. As to the other issues raised by Williams, we find no error in the opinion of the Court of Criminal Appeals.
 I. Alleged Abuse of the Grand Jury Process A.
Williams contends that the Mobile County district attorney engaged in prosecutorial misconduct that violated his right to due process and a fair trial under the United States and Alabama Constitutions, and he *Page 1353 
argues that that alleged misconduct requires reversal of his convictions and sentence. The district attorney subpoenaed Ellzey, who was Williams's ex-wife and who at trial was the lead defense witness, to testify before the May 1992 grand jury. Ellzey had not been called to testify before the April 1992 grand jury that had indicted Williams on the two counts of capital murder and two counts of attempted murder — the attempted murders of Jeffery Carr and Brad Barber. The April grand jury had "no-billed" the charges against Williams for the attempted murders of Clair Paravicini and Buford Billedeaua. The district attorney brought those two no-billed attempt charges before the May grand jury; the district attorney called Ellzey to testify before the grand jury and cross-examined her. Later, the district attorney asked the May grand jury to no-bill those charges.
Williams argues that the district attorney did not call Ellzey to testify before the May grand jury to gain information regarding the attempted murders of Clair Paravicini and Billedeaua, because, Williams says, Ellzey had no knowledge of those crimes. Williams further claims that the district attorney's request for a no-billing of those attempted murder charges during the May grand jury, which charges had been already no-billed by the April grand jury, indicates that the charges were simply a pretext the district attorney used for calling Ellzey before the May grand jury in order to get sworn testimony from her. Williams refers this Court to the following statement made by the district attorney during the trial court's hearing on Williams's motion for a new trial:
 "It is my position — I guess somebody in Montgomery will tell me sooner or later whether I am right or wrong — that a case is under investigation until literally the moment it goes to trial. And, you know, I don't quibble with his dates. I don't deny that [Ellzey] was called in after [Williams] was indicted, but I felt it necessary to get a statement from her under oath."
In sum, Williams argues that the district attorney abused the grand jury process by using it as a post-indictment tool to continue investigating the capital murder case against him. Williams says that the district attorney used the grand jury process to obtain improper discovery regarding the theory of his defense and to obtain impeachment material for use at trial, and Williams argues that this use of the grand jury process violated well-established safeguards concerning the function of a grand jury. He notes that his trial counsel were not given a transcript of Ellzey's grand jury testimony until trial, and he claims that the district attorney caught his counsel by surprise and used Ellzey's grand jury testimony in a prejudicial manner. He asks this Court to grant him a new trial in which the State is not allowed to use Ellzey's grand jury testimony, which he calls the "fruits of the [alleged] grand jury abuse."
 B.
In response, the State first notes that Williams did not raise the issue of alleged prosecutorial abuse of the grand jury process until after his conviction, when he filed a motion for a new trial. Citing United States v. Thompson,944 F.2d 1331 (7th Cir. 1991), cert. denied, 502 U.S. 1097,112 S.Ct. 1177, 117 L.Ed.2d 422 (1992), and In re Grand Jury SubpoenaDuces Tecum Dated January 2, 1985, 767 F.2d 26 (2d Cir. 1985), the State contends that the proper way to challenge an alleged abuse of the grand jury process is by filing a motion to quash the subpoena or by filing a motion before trial to dismiss the indictment. Thus, the State says that this issue was not properly preserved by Williams for appeal and, thus, is reviewable by this Court only under the "plain error" standard.
The State argues that the district attorney's purpose for calling Ellzey to testify before the May grand jury was to further an ongoing investigation against Williams for the attempted murders of Clair Paravicini and Billedeaua. The State admits that at the hearing on Williams's motion for a new trial the district attorney at first stated that he had subpoenaed Ellzey before the May grand jury in order to get her sworn testimony (as quoted above); however, the State notes that later during the same hearing the district attorney offered further explanation as to why he called Ellzey to testify before the May grand jury: *Page 1354 
 "When Ms. Ellzey testified in May of 1992 it wasn't an after-the-fact effort to garner more information as it related to the homicides. She testified in a pending case relating to two attempted murder charges that were then and there before the grand jury, and the docket sheet which is on its way to the court right now will so reflect."
The State notes that the district attorney had called Jeffery Carr, Clair Paravicini, Brad Barber, and Buford Billedeaua before the April grand jury to testify regarding the capital murder charges against Williams and regarding the charges relating to the attempted murders of Jeffery Carr and Brad Barber. The grand jury returned indictments on those charges. The State argues that the district attorney then decided to investigate the attempted murders of Clair Paravicini and Billedeaua and that Ellzey was called before the May grand jury because she was the only witness who could shed further light on those attempted murders who had not yet testified before a grand jury, The State says that the district attorney knew from the statement Ellzey gave to the police on the day of the killings that Ellzey had been on the telephone with Williams and had heard Williams talk to Clair Paravicini. Thus, the State contends that the reason Ellzey was subpoenaed to appear before the May grand jury was to question her regarding what she heard over the telephone in relation to the attempted murder of Clair Paravicini.
Finally, the State says that it had no reason to call her to testify in order to gain ex parte discovery or to gain impeachment information, because, on the morning of the killings, Ellzey had given the police a thorough statement that the State says is identical to her grand jury testimony. The State further contends that Williams's defense counsel knew that Ellzey had given a statement to police, because defense counsel were given a copy of the statement. Thus, the State argues that Williams could not have been surprised by the State's use of any of Ellzey's grand jury testimony, since the information was already available to the defense through her identical police statement.
In sum, the State contends that there was no error in the district attorney's subpoenaing Ellzey to the May grand jury and, thus, no "plain error."
 C.
Rule 12.3, Ala.R.Cr.P., sets out the powers and duties of an Alabama grand jury, including the power and duty to inquire into indictable offenses. However, the power of a grand jury has its limits, as noted by the Committee Comments to Rule 12.3, which quote with approval the following statement fromFields v. State, 121 Ala. 16, 17, 25 So. 726, 727 (1899): "The functions and powers of the grand jury as to the indictment so returned are ended when the presentment is made and the indictment or true bill is received by the court." (Emphasis added.) Thus, although a district attorney may continue to investigate a crime until the very time of the trial, once an indictment has been returned by a grand jury the function of that grand jury is complete as to that crime and the grand jury cannot be used as a means for further investigation. Stated otherwise, "[i]t is improper to utilize a Grand Jury for the sole or dominating purpose of preparing an already pending indictment for trial." United States v. Dardi, 330 F.2d 316,336 (2d Cir.), cert. denied, 379 U.S. 845, 85 S.Ct. 50,13 L.Ed.2d 50 (1964).
Williams argues that the district attorney subpoenaed Ellzey — his ex-wife, who was later the lead defense witness — to testify before the May grand jury for the sole or dominating purpose of preparing for the prosecution of the capital murder indictments that had been returned by the grand jury a month previously. However, the State is correct in its argument that because Williams failed to make a timely objection during trial to the district attorney's use of Ellzey's grand jury testimony we can review this issue only under the "plain error" standard. Rule 39(k), Ala.R.App.P. Plain error is error that "has or probably has adversely affected the substantial rights of the petitioner." Id. "In other words, the plain-error exception to the contemporaneous-objection rule is to be 'used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise *Page 1355 
result.' " United States v. Young, 470 U.S. 1, 15,105 S.Ct. 1038, 1042, 84 L.Ed.2d 1 (1985), quoting United States v.Frady, 456 U.S. 152, 163, n. 14, 102 S.Ct. 1584, 1592, n. 14,71 L.Ed.2d 816 (1982). Thus, we must determine whether the district attorney subpoenaed Ellzey before the May grand jury for the sole or dominating purpose of preparing the pending capital murder indictments for trial and, if so, whether such action constitutes "plain error."
In regard to this claim of error by Williams, the Court of Criminal Appeals held:
 "Considering that the investigation of charges pertaining to Clair Paravicini and Buford Billedeaua was properly pending before the May grand jury, considering the statement given the investigators by Ellzey shortly after the crimes were committed and that that statement contained substantially the same information that Ellzey gave the grand jury, and considering the statement of the prosecutor that he called Ellzey before the grand jury partly to further explore the possibilities of indicting the appellant for the attempted murder of Clair Paravicini and Buford Billedeaua, we cannot conclude, as the appellant urges us to do, that the sole or dominating purpose of the prosecutor was to prepare the already pending indictments for trial. We find no abuse of the grand jury process from this record."
Williams v. State, 710 So.2d at 1295.
After thoroughly studying Ellzey's grand jury testimony, in the context of the facts of this case, we conclude that the Court of Criminal Appeals correctly held that the district attorney did not call Ellzey before the May grand jury for the sole or dominant purpose of obtaining discovery and impeachment evidence for use during Williams's capital murder trial. When Ellzey testified before the grand jury, charges were still pending against Williams for the attempted murders of Clair Paravicini and Buford Billedeaua. A large portion of Ellzey's grand jury testimony specifically relates to the facts surrounding Williams's alleged attempted murder of Clair Paravicini. Ellzey was on the telephone with Williams when he shot Jeffery Carr and Gerald Paravicini and threatened Clair Paravicini and struck her in the face with the rifle, knocking her down.
For example, the following appears in Ellzey's grand jury testimony:
 "[Q]: All right. At about 6 o'clock in the morning he called you. Tell us, please, ma'am, the details of that conversation. What he said to you, what you said to him?
 "[A]: All right. . . . And pretty soon, I hear — they live in a trailer and the doors are so small and they're cheaply built — what sounded like to me on the phone, it sounded like, kinda like two people, fat people, who are trying to get out of the door and they kind of like bumped and hit the wall it was a sound kind of like that. It wasn't anything big, no crashing, or anything like that. It just kind of was like a bump, like somebody had fell up against the wall. And I heard Clair say something to Jay [Jason Williams], asking him for help. And he asked her where her purse was so he could get her keys and take her to the hospital. To me, it sounded like she was asking him for help and he was trying to give her help. But I — I had talked to him — this happened at about 6:20, was when he dropped the phone. Somebody picked the phone back up and it seemed to be — I don't know if it was a wall phone or a cordless phone, but I could hear the phone hitting something like that (indicating), like it was swinging on a cord or something, somebody picked it up and I was going, 'Jay, Jay,' and the phone dropped again and then I didn't hear anything else.
 "[Q]: Okay. Now, you heard what sounded like a bump, which in reality was a shot.
"[A]: It didn't sound anything like a shot.
 "[Q]: Okay. Did you hear a second shot or a second loud noise of any kind?
"[A]: It — It — It wasn't loud. It was like —
"[Q]: Okay.
 "[A]: It was like a rolling like type. Just as if I stood up against this wall and, you know, fell back against it, it was a *Page 1356 
sound like that. I did hear that sound twice.
". . . .
"[Q]: All right. Did you hear Gerald Paravicini?
 "[A]: Never heard. I never heard nobody's voice but Jay [Jason Williams] and Clair's.
". . . .
 "[Q]: Well, when you heard Clair holler, what did you hear her yell?
 "[A]: She was asking 'Jay.' She said 'Help me, Jay.' And he said, 'Where's your purse?' He asked her where her purse was, that he wanted to get her keys. And then he came back to the phone, and we had said a few more things, and then I said, 'What's going on? and then about that time, I heard her ask him again, ask her something — her ask him something — but I really couldn't hear what she was saying the second time she said something to him. I couldn't understand what she was saying.
". . . .
"[Q]: Did you hear Mrs. Paravicini start to cry?
"[A]: No.
". . . .
 "[Q]: In terms of the sequence of events, he had actually shot Mr. Paravicini and struck Mrs. Paravicini, but yet he continued to talk with you on the phone?
 "[A]: If that's what they say happened, I guess that's what happened. I wasn't there, I was just on the phone —
". . . .
 "[Q]: Okay, whether she was screaming or not, did she sound upset to you?
"[A]: Yes.
"[Q]: Did you hear her cry?
 "[A]: I could tell she was real upset, but I couldn't actually, you know, I really, it happened so fast, you know."
The transcript of Ellzey's testimony indicates to us, as it did to the Court of Criminal Appeals, that the district attorney called Ellzey before the May grand jury to further investigate the charge against Williams for the attempted murder of Clair Paravicini. That charge against Williams was no-billed by the April grand jury, and after Ellzey's testimony it was no-billed by the May grand jury at the request of the district attorney. The district attorney has stated that he made that request because he believed the case against Williams for the charge of the attempted murder of Clair Paravicini was weak and that he did not wish to weaken his overall case against Williams by bringing a weak charge to trial. Although Williams suggests that the district attorney's request of the May grand jury to no-bill the Clair Paravicini attempted murder charge indicates that the district attorney's statement that he called Ellzey before the grand jury to further investigate that crime is simply a pretext, we cannot make that same assumption.
It is clear to this Court that the district attorney had no need to subpoena Ellzey before a grand jury in order to obtain discovery regarding Williams or impeachment material against Ellzey; the district attorney already had available for those purposes the lengthy statement Ellzey gave to the police on the day of the killings. Having thoroughly studied and compared the transcript of Ellzey's grand jury testimony with the statement she gave to the police, we conclude that there is no significant difference between them; the two statements are nearly identical, and the grand jury testimony contained no additional information that could have benefited the district attorney's case. Both contain references to Williams's family history, his drug use, his suicide attempt in 1990, the events of the evening before the killings, what Ellzey heard over the telephone during her conversation with Williams on the morning of the killings, and what she believed his mental state to be at that time. The district attorney could have used the statement Ellzey gave to the police to gain information regarding Williams's personal history or to impeach Ellzey at trial as easily as he could have used her grand jury testimony. In fact, the district attorney did use a particular quote found only in Ellzey's police statement to impeach her at trial (see section IV of the Court of Criminal Appeals' opinion, 710 So.2d at 1297-98).
Finally, we find no merit to Williams's contention that his trial counsel did not know *Page 1357 
that Ellzey had been subpoenaed before the May grand jury and that they were surprised by the district attorney's use of her sworn testimony at trial. Ellzey is the defendant's ex-wife and was the primary defense witness, and the record indicates that Williams knew before trial that she had appeared before the grand jury. Further, a copy of Ellzey's police statement had been provided to Williams's defense counsel before trial. Thus, as explained above, Williams's counsel could not have been surprised by the content of her grand jury testimony.
We find no merit to Williams's argument that the sole or dominant purpose for the district attorney's calling Ellzey before the May grand jury was to prepare the pending capital murder indictments for trial.[3] Moreover, even if we were to hold that the actions of the district attorney were improper — and we do not so hold — the prosecutor's calling Ellzey before the grand jury did not adversely effect any of Williams's substantial rights. We find no plain error.
 II. Conclusion
As noted previously, this Court has reviewed the record and the briefs, has considered the oral arguments before this Court, and has examined the determinations of the Court of Criminal Appeals in relation to all of the issues raised by Williams. This Court has also thoroughly examined the record for plain error, but has found none. We have reviewed the trial court's imposition of the death sentence against Williams, in accordance with Ala. Code 1975, § 13A-5-53, and we find no impropriety. Thus, we conclude that the Court of Criminal Appeals committed no error in affirming Williams's convictions and sentence, and we affirm the judgment of the Court of Criminal Appeals.
AFFIRMED.
HOOPER, C.J., and MADDOX, ALMON, HOUSTON, KENNEDY, COOK, and SEE, JJ., concur.
[1] Williams says that his parents abandoned him when he was a young child; that he was placed in the care of an aunt and the aunt's husband and that while he was in their care the aunt's husband beat him; and that he was placed in a children's home in Mississippi and while there suffered physical and sexual abuse. He says that these problems caused the personality disorder he now claims to suffer from.
[2] This discussion of the facts is based on Clair Paravicini's trial testimony and is somewhat different from Sandra Ellzey's grand jury testimony regarding what she heard over the telephone.
[3] However, like the Court of Criminal Appeals, we caution district attorneys to be certain that the purpose for the post-indictment use of a grand jury, and the facts and circumstances supporting that use, clearly appear on the record.