[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 872 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 873 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 874 
Stephen Pilley appeals from his conviction on a charge of capital murder, see § 13A-5-40(a)(10). Pilley was tried before a jury on the charge that he murdered five persons pursuant to one scheme or course of conduct. Following a guilty verdict, the jury recommended, by a 12-0 vote, that Pilley be sentenced to death by electrocution. On May 30, 1997, the trial court sentenced Stephen Pilley to death. This appeal follows. We affirm.
The State's evidence tends to show the following. On the morning of October 16, 1994, the bodies of Lester Edward Dodd, Pamela Dodd, William A. Nelson, Sr., James Watkins, and Florence Adell Elliott were found in the Changing Times Lounge, a neighborhood bar, in Birmingham. The Dodds, who worked at the bar, were found lying facedown in the pooltable area of the lounge, while the other three, who were regular bar patrons, were found lying facedown in the bar area. The positions of the bodies suggested an "execution style" killing. All five died from gunshot wounds to the top or back of the head inflicted by two distinctive types of *Page 875 
handgun ammunition: .25 caliber CTI Blazer bullets and 9mm Glazer bullets. A forensic expert testified that, while no guns were ever recovered, he was certain that two weapons had been used in these murders. The bar had been ransacked, the cash register emptied, and the personal effects of the victims scattered around the bar.
A bartender at the Crazy Eights Bar in Bessemer testified that, around 7:00 p.m. on October 15, 1994, while working in the bar, he overheard Pilley and Andrew Apicella discussing a way to make some "easy money." The bartender testified that he heard Pilley tell Apicella that he did not have a gun, and Apicella responded by telling him he could get guns. Shortly after this conversation, Pilley and Apicella left the Crazy Eights Bar.
Five customers who had been at the Changing Times Lounge at various times the night of October 15, 1994, identified Pilley as having been in the bar that night with another male. These witnesses remembered Pilley and his friend because they were not regular customers and because Pilley would yell at persons putting money in the jukebox to play country music. While Pilley's friend was playing pool, Pilley would wander about the bar. The last of these witnesses to leave the bar testified that when he left at between 11:30 p.m. and midnight, Pilley and his friend were still in the bar with about five other customers and the Dodds.
Rhonda Haynes, a friend of Pilley's, testified that, after she had gone to bed on the night of October 15, 1994, Pilley and Andrew Apicella came to her house unannounced, and asked her to arrange for a motel room where they could spend the night. They stayed with her until daybreak, injecting each other with a cocaine solution. During that stay, Haynes helped the two men count and divide money they claimed to have won at a bar playing pool, amounting to $150 for each man. From this money, Pilley handed Haynes five $2 bills, asking her to hold them for him.
The former testimony of Pamela Haddix was read into evidence, indicating that Ms. Haddix had lived with one of the victims, William A. Nelson, Sr. According to Ms. Haddix's testimony, it was their custom to save $2 bills to give to their grandchildren as gifts. Ms. Haddix testified that, at the time of his death, Mr. Nelson had five $2 bills folded in a "secret pocket" in his wallet.
A lawyer, retained by the Apicella family on an unrelated matter, turned over to police jewelry that was subsequently identified as belonging to Pamela Dodd.
 I.
Pilley argues that the evidence was insufficient to sustain a conviction for capital murder. Specifically, he argues that there was no direct evidence and that the circumstantial evidence was not sufficient to sustain the conviction, that there was no evidence of Pilley's particularized intent to kill, and that there was no evidence of Pilley's complicity in the acts of robbery and murder.
 "`"In reviewing the sufficiency of the evidence the appellate courts of this State are bound by several well settled rules. It is not the function of this Court to decide whether the evidence is believable beyond a reasonable doubt and to a moral certainty. Instead, the function of this Court is to determine whether there is legal evidence from which a jury could by fair inference find the defendant guilty. Cumbo v. State, 368 So.2d 871, (Ala.Cr.App.), cert. denied, 368 So.2d 877 (Ala. 1979); Scruggs v. State, 359 So.2d 836, 842 (Ala.Cr.App.), cert. denied, 359 So.2d 843 (Ala. 1978). *Page 876 
 "`"In determining the sufficiency of the evidence to sustain the conviction, this Court must accept as true the evidence introduced by the State and accord the State all legitimate inferences therefrom. Ellis v. State, 338 So.2d 428 (Ala.Cr.App. 1976); Edson v. State, 53 Ala. App. 460, 301 So.2d 226 (1974). The evidence must be considered in the light most favorable to the prosecution. Colston v. State, 57 Ala. App. 4, 325 So.2d 520, cert. denied, 295 Ala. 298[398], 325 So.2d 531 (1975[(1976)]).
 "`"Where there is legal evidence from which the jury can by fair inference find the defendant guilty, this Court has no right to disturb the verdict. Bell v. State, 339 So.2d 96 (Ala.Cr.App. 1979[(1976)]). A verdict of conviction will not be set aside on the ground of insufficiency of the evidence, unless, allowing all reasonable presumptions for its correctness, the preponderance of the evidence against the verdict is so decided as to clearly convince this Court that it was wrong and unjust. Bridges v. State, 284 Ala. 412, 225 So.2d 821
(1969); Morton v. State, 338 So.2d 423 (Ala.Cr.App. 1976).
 "`Freeman v. State; 505 So.2d 1079 (Ala.Cr.App. 1986), quoting, Johnson v. State, 378 So.2d 1164, 1169
(Ala.Cr.App. 1979), writ quashed by Ex parte Johnson, 378 So.2d 1173 (Ala. 1979)." Anderson v. State, 542 So.2d 292, 295-96 (Ala.Cr.App. 1987), cert. quashed, 542 So.2d 307 (Ala. 1989).'"
Anderson v. State, 542 So.2d 292, 295-96 (Ala.Cr.App. 1987), quoted in Bankhead v. State, 585 So.2d 97, 104 (Ala.Cr.App. 1989), aff'd. in part, remanded, 585 So.2d 112 (Ala. 1991), aff'd. on return to remand,625 So.2d 1141 (Ala.Cr.App. 1992), rev'd on unrelated grounds, 625 So.2d 1146
(Ala. 1993).
Where a defendant's conviction is based solely on circumstantial evidence, "if the circumstances can be reconciled with the theory that someone else may have done the act, then the conviction is due to be reversed." Ex parte Brown. 499 So.2d 787, 788 (Ala. 1986). "Circumstantial evidence alone is enough to support a guilty verdict of the most heinous crime, provided the jury believes beyond a reasonable doubt that the accused is guilty." White v. State, 294 Ala. 265, 272,314 So.2d 857, cert. denied, 423 U.S. 951, 96 S.Ct. 373, 46 L.Ed.2d 288
(1975). "Circumstantial evidence is in nowise considered inferior evidence and is entitled to the same weight as direct evidence provided it points to the guilt of the accused." Cochran v. State,500 So.2d 1161, 1177 (Ala.Cr.App. 1984), aff'd. in part, reversed in part on other grounds, 500 So.2d 1179 (Ala. 1985). "It is not necessary for a conviction that the defendant be proved guilty to the `exclusion of every possibility of innocence'" Burks v. State, 117 Ala. 148, 23 So. 530
(1898). "The facts and circumstances in evidence, if dissevered and disconnected, may be weak and inconclusive; but their probative force, when combined, as it was the province of the jury to combine them, under proper instructions from the court, may have satisfied them of the guilt of the defendant." Howard v. State, 108 Ala. 571, 18 So. 813, 815
(1895).
"`Intent, being a state of mind, is rarely, if ever, susceptible of direct or positive proof, and must usually be inferred from the facts testified to by witnesses in the circumstances as developed by and through the evidence.'" Hunt v. State, 642 So.2d 999, 1008 (1993), quoting the trial court's oral charge to the jury. Likewise, the culpable participation of an accomplice is rarely proved by positive testimony. "Rather, the jury must examine the conduct of the parties and the *Page 877 
testimony as to the surrounding circumstances to determine its existence." Travis v. State, 776 So.2d 819, 863 (Ala.Cr.App. 1997).
In this case, the trial court properly instructed the jury on the use of circumstantial evidence in its deliberations. (R. 657-60.) The trial court also correctly instructed the jury on the requisite specific intent to kill (R. 669-70) and the law of complicity (R. 660-63).
The evidence before the jury indicated that Pilley had been in the Changing Times Lounge previously, and that he knew the layout of the bar. (R. 364.) There was testimony that the night of the murders he had been overheard discussing obtaining weapons and "easy money." (R. 379.) Witnesses saw him and Andrew Apicella in the Changing Times Lounge late on the night of the murders. Witnesses described him as acting nervous during the evening. At one time, he asked a bar patron if Edward Dodd owned the bar and whether Dodd was carrying a gun. (R. 441.) Evidence indicated that two weapons were used in the murders; the position of the bodies of the victims when found indicated the five victims had been separated — the Dodds were killed in the pooltable area of the bar, and the three customers were killed on the other side of the establishment. That the victims appeared to have been laid on their faces with their heads in their hands before being shot in the head indicates that they had been deliberately "executed" by their killers. Later that evening, Pilley and Apicella split approximately $800, including five $2 bills, similar to the bills that one of the murder victims had kept in his wallet. (R. 521.) Later, the Apicella family's lawyer turned over to the police jewelry belonging to Pamela Dodd.
Accepting as true all the evidence introduced by the State, and according the State all legitimate inferences therefrom, and viewing the evidence in the light most favorable to the prosecution, we conclude there was sufficient evidence from which the jury could have found Pilley either was directly responsible for the murders or was an accomplice, and that he possessed the requisite specific intent to kill. The evidence is sufficient to sustain the jury's finding of guilty as to the capital murder charge. Carden v. State, 621 So.2d 342, 347 (Ala.Cr.App. 1992).
Because Pilley argues the evidence was insufficient to sustain a conviction for capital murder, he argues that the trial court erred in denying his motion for a judgment of acquittal.
 "The trial court's denial of a motion for judgment of acquittal must be reviewed by determining whether there was legal evidence before the jury at the time the motion was made from which the jury by fair inference could find the defendant guilty. Thomas v. State, 363 So.2d 1020 (Ala.Cr.App. 1978). In applying this standard, this court will determine only if legal evidence was presented from which the jury could have found the defendant guilty beyond a reasonable doubt. Willis v. State; 447 So.2d 199 (Ala.Cr.App. 1983). When the evidence raises questions of fact for the jury and such evidence, if believed, is sufficient to sustain a conviction, the denial of a motion for judgment of acquittal does not constitute error. McConnell v. State, 429 So.2d 662 (Ala.Cr.App. 1983)."
Ward v. State, 610 So.2d 1190, 1191 (Ala.Cr.App. 1992).
Having found that the evidence was sufficient to sustain a finding of guilty of capital murder, we find the trial court did not err in denying a motion for a judgment of acquittal. *Page 878 
 II.
Pilley argues that the trial court erred in denying a motion for a mistrial when, after the jury had been struck, but before the presentation of evidence, there was contact between a member of the district attorney's office and a juror.
On the second morning of trial, before the jury was brought in, the prosecutor announced to the trial court that it had come to his attention that Lane Tolbert, a member of the district attorney's office not involved with the prosecution of this case, had received a telephone call from one of the jurors the evening before. According to the prosecutor, when his office had received the juror's list, Mr. Tolbert had said that he might know one of the jurors. The prosecutor asked Mr. Tolbert to look at the jurors through a window to make sure this was the person he knew, but, instead, Mr. Tolbert telephoned the juror's wife and affirmed that the man he knew was the same person sitting on the jury. (R. 182.) Mr. Tolbert was questioned by the trial court, and related what had happened as follows:
 "THE COURT: What all took place in the conversation, Mr. Tolbert?
 "MR. TOLBERT: Actually, it was a return of a call to his wife. I had called yesterday. I did not ask him to call me by any means. He called me and said — called me and said jokingly, `Why did you call my wife?' I said just because she was at home. He then said something, `I didn't realize where you worked.' I said, `That's all right unless they ask you.' He said, `Well, they did ask me but I wasn't sure exactly what you did.' I said, `All right. Is that going to affect your decision in any way?' I was trying to minimize this as much as I could. He said, `No.' I said, `Okay. Well, that's about it.' And I told him I would avoid him until after this is over with."
(R. 177.)
At that point, trial counsel made a motion for a mistrial based on the communication between a juror and a member of the district attorney's office. The trial court deferred ruling on the motion until he had a chance to talk with the juror. The juror was called into the court, where the trial court questioned him as follows:
 "THE COURT: Mr. W., if you would, just have a seat just a minute. As I understand, Mr. Tolbert knows you from church; is that correct?
"MR. W.: He goes to my —
 "THE COURT: As I understand, y'all had a conversation. Can you tell me what all took place in the conversation that you had with Mr. Tolbert last night?
 "MR. W.: I called Lane. He had called my house and told my wife that he had seen me on the list. Said that was about it. I had called him and he had asked me what was going on. I said that we couldn't talk about it. I didn't even mention the fact that I knew him because I didn't know what he did.
"THE COURT: Uh-huh. Okay.
 "MR. W.: He said, `Well, that's all right. Just, you know, don't, you know, let anything be changed or don't do anything because you know me.'
 "THE COURT: Do you remember any other part of the conversation?
 "MR. W.: Well, no, sir. I really don't other than the fact that he called my house."
(R. 180-81.) After the trial court cautioned the juror not to talk to the other jurors about his knowing Mr. Tolbert, Mr. W. replied,
 "MR. W.: Yes, sir. Well, I was wondering about that. And I didn't know and I *Page 879 
kind of felt bad, but, like I said, I don't know what Lane does.
 "THE COURT: At the time of jury organization, you did not know what his position was?
"MR. W.: I still don't know what his position is."
(R. 181-82.) The trial court then denied the motion for a mistrial.
"[A] mistrial is a drastic remedy that should be used sparingly and only to prevent manifest injustice." Ex parte Thomas, 625 So.2d 1156,1157 (Ala. 1993). Even contact between a juror and a witness does not necessarily require a mistrial. Ex parte Weeks, 456 So.2d 404 (Ala. 1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2051, 85 L.Ed.2d 324
(1985). It is within the trial court's discretion to determine whether the contact was prejudicial to the appellant and it is within the court's discretion to order a mistrial. Newsome v. State, 570 So.2d 703
(Ala.Cr.App. 1989). The trial court's determination will be reversed on appeal only upon a showing of a clear abuse of discretion. Ex parte Jefferson, 473 So.2d 1110 (Ala. 1985), cert. denied, 479 U.S. 922,107 S.Ct. 328, 93 L.Ed.2d 300 (1986).
Here the trial court questioned both parties to the telephone conversation. Even though the juror initiated the telephone call, he was returning a church friend's phone call and he expressly declined to discuss the case. He said that he did not know what Mr. Tolbert did for a living. Under these circumstances, we conclude that the trial court did not abuse its discretion in denying the motion for a mistrial. See Williams v. State, 403 So.2d 317, 319 (Ala.Cr.App. 1981).
Pilley also argues that the trial court erred in not removing Mr. W. from the jury. He points to the fact that Mr. W. was ultimately selected as jury foreperson, and implies that, as the foreperson, it was Mr. W. who "brought back a guilty verdict and a unanimous recommendation for the death sentence" because, Pilley argues, he was a friend of the prosecutor. This implication that Mr. W. was somehow solely responsible for the guilty verdict and death penalty recommendation is without any factual basis in the record.
After the trial court denied Pilley's motion for a mistrial, trial counsel asked that Mr. W. be removed from the jury or, at least, that he be relegated to the role of an alternate juror. Trial counsel based this request on the fact of the contact between the district attorney's office and Mr. W. and also because Mr. W. had not come forward and informed the court of his telephone conversation with Lane Tolbert. The trial court noted that, like everyone else, Mr. W. had just arrived, and the court did not know whether Mr. W. would have eventually informed the court or not. (R. 184.) The trial court took Pilley's requests under advisement, but ultimately refused both requests.
"To justify a challenge of a juror for cause[,] there must be a statutory ground . . . or some matter which imports absolute bias or favor, and leaves nothing to the discretion of the trial court." Nettles v. State, 435 So.2d 146, 149 (Ala.Cr.App.), aff'd, 435 So.2d 151 (Ala. 1983). The trial court's ruling on this request for the removal of a juror based on a contact with a member of the district attorney's office is entitled to great weight and will not be disturbed on appeal unless it is clearly shown to be an abuse of discretion. Price v. State;383 So.2d 884 (Ala.Cr.App.), cert. denied, 383 So.2d 888 (Ala. 1980).
Based on the record, we cannot say that the juror's telephone conversation with Lane Tolbert (or any subsequent behavior by the juror) constituted misconduct that might have prejudiced the appellant. *Page 880 
Thomas v. State, 622 So.2d 415 (Ala.Cr.App. 1992). it was undisputed that, at the time of the telephone conversation and the next morning in the courtroom, Mr. W. did not know what Lane Tolbert's position was. And the record is silent as to whether Mr. W. purposely did not inform the court of his contact with Mr. Tolbert, or whether he was called into the courtroom before he had an opportunity to inform the court of that contact. Given the state of the record, we are not persuaded that the trial court clearly abused its discretion in declining to remove Mr. W. from the jury.
 III.
Pilley argues that the trial court erred in not declaring a mistrial because, he says, the State did not disclose to the defense an allegedly incriminating statement Pilley made to a State witness, who was a customer at the Changing Times Lounge the night of the murders. During the direct examination of James David Odom, the prosecutor was asking Mr. Odom about conversations he had had with Pilley at the bar. At the close of his examination, the prosecutor asked Mr. Odom:
"Q: All right, sir. Did he say anything else?
 "A: Well, he wanted to know if Eddie owned the place and if Eddie had a gun in his back pocket."
(R. 441.) At that point, trial counsel asked for a sidebar conference with the trial court. At the conclusion of the conference, the prosecutor had no further questions of the witness. After the witness left the stand, and outside the presence of the jury, the following took place:
 "THE COURT: All right. Prior [to] or during the course of Mr. Odom's testimony we had a sidebar and at that time an objection was made to the statement and I said that I would allow counsel to put their objection in and it's timely made at this time. So go ahead, Virginia.
 "MS. VINSON [trial counsel]: Yes, sir. Our objection was grounded on the fact that during the discovery process prior to trial, we . . . never received any statement that Mr. Pilley allegedly made to Mr. Odom. That was the first that we've heard of it when Mr. Odom took the witness stand. We have, we believe, been duly diligent in obtaining the discovery material. The state had made an open file discovery, but that wasn't there. We didn't know about it and we object to that. They did cut the questioning off after we got back on the record, but we still object to that being slipped out by the witness. And we would ask for a mistrial at this time.
 "THE COURT: All right. I'll overrule as to a mistrial. I think the questioning stopped in that regard. And, of course, if open file has been granted, then that's all that could be done. But I'll overrule the motion for a mistrial."
(R. 456-57.) Trial counsel then asked that the prosecutor not be allowed to make any further reference to the statement made by Mr. Odom. Before the trial court could rule on this request, the prosecutor agreed to make no further reference to the statement. The trial court concurred in the parties' agreement. (R. 457.)
Pilley argues that the State's failure to disclose his statement, in which he asked Mr. Odom about Eddie Dodd and whether he was carrying a gun, violated Rule 16.1, Ala.R.Crim.P., and the scope of discovery governed by the United States Supreme Court's decision in Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). We do not agree.
Rule 16.1, Ala.R.Crim.P., requires the State to disclose to the accused only *Page 881 
those "statements made by the defendant to any law enforcement officer, official, or employee." A defendant's statement to a private citizen is not within the purview of Rule 16.1 and need not be disclosed. Ford v. State; 628 So.2d 1068, 1071 (Ala.Cr.App. 1993); Kuenzel v. State,577 So.2d 474, 510 (Ala.Cr.App. 1990), aff'd, 577 So.2d 531 (Ala. 1991), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991). Because the appellant's statement to Mr. Odom contained no exculpatory information, its production was not required under Brady v. Maryland. Ex parte Dickerson. 517 So.2d 628 (Ala. 1987).
However, the trial court had approved that portion of the defense's discovery request that asked the State to disclose:
 "A written summary of any and all verbal assertations allegedly made by the Defendant to any person relating to the material issues of this case, whether recorded or not."
(C.R.37.) Nothing in the record indicates that the prosecutor opposed this particular request as being beyond the scope of Rule 16.1, Ala.R.Crim.P. In fact, the prosecutor not only cut off his questioning of Mr. Odom when trial counsel requested the sidebar conference, but readily agreed not to mention the objected-to testimony during argument. Because of the peculiar circumstances in this case, where the parties apparently agreed to, and were attempting to comply with, an enhanced "open file" discovery order, we believe it is appropriate to apply the established precedent from the civil law that agreements made in a pretrial order are binding on the parties and that, therefore, that order controls the subsequent course of the action. Kirkland Co. v. A M Food Serv., Inc., 579 So.2d 1278 (Ala. 1991). We hold that the prosecutor was bound to comply with this pretrial discovery order, even though it was beyond the requirements of Rule 16.1, Ala.R.Crim.P.; the State violated the discovery order by not providing the defense with a summary of Pilley's statement to Mr. Odom.
However, the granting of a mistrial is not the only appropriate remedy for a violation of the discovery order. "[A] mistrial is a drastic remedy, to be used sparingly and only to prevent manifest injustice." Ex parte Thomas, supra, 625 So.2d at 1157. Rule 16.5, Ala.R.Crim.P., allows the trial court to fashion a remedy for noncompliance with a discovery order that "the court deems just under the circumstances." That remedy could range from a mistrial to a continuance. "The trial court should not impose a sanction which is harsher than necessary to accomplish the goals of the discovery rules." McCrory v. State; 505 So.2d 1272, 1279
(Ala.Cr.App. 1986). In this case, after the trial court declined to grant the defense's motion for a mistrial, the only other remedy requested by the defense — that the prosecutor not make any further references to the statement during the presentation of his case — was granted. Thus, as a result of noncompliance with the discovery order, all further questioning of Mr. Odom was cut off, and no further reference to the defendant's statement was allowed. Under the circumstances of this case, we cannot say that the trial court clearly abused its discretion in denying the request for a mistrial and in fashioning another, more appropriate, remedy. See, McLemore v. State, 562 So.2d 639, 645
(Ala.Cr.App. 1989).
 IV.
Pilley next argues that the trial court erred in admitting into evidence a videotape of the crime scene. Pilley argues that the videotape was cumulative of the "numerous photographs of the scene showing the lounge, the dead bodies, the *Page 882 
purse opened and ransacked" that were presented to the jury. At trial, trial counsel objected to the videotapes on the basis that it was cumulative of those photographs marked state's exhibits 13, 14, 16, 17, 18, 19, 20, 27, and 31. The trial court noted that it had reviewed the videotape and would allow it to be shown, after a proper foundation was laid. (R. 540.) At that point, there was a brief discussion off the record and trial counsel announced that the photographic exhibits as to which she had thought the videotape was cumulative had not been introduced into evidence by the State. (R. 540-41.) She was correct. While the State had marked the photographic exhibits and had questioned the evidence technician responsible for taking the photographs, the State had never introduced them into evidence until the sentencing phase of the trial. Thus, when the videotape was introduced into evidence, no other photographic evidence of the crime scene had been admitted into evidence. Therefore, the trial court did not err in admitting into evidence the properly authenticated videotape. See Ex parte Siebert, 555 So.2d 780, 783
(Ala. 1989).
We note that the crime-scene photographs marked state's exhibits 13 through 20 were admitted into evidence,[1] without objection, at the sentencing phase of the trial, along with all other evidence admitted during the guilt phase of trial. Thus, both the videotape and photographic evidence of the undisturbed crime scene were before the jury at sentencing.
In reviewing for plain error the admissibility into evidence at sentencing of the crime scene videotape and the photographs, we find no plain error. Rule 45A, Ala.R.App.P. A videotape of the crime scene is admissible over the defendant's objections that the tape was inflammatory, prejudicial, and cumulative. Ex parte Siebert,555 So.2d at 783. Photographic evidence is admissible in a criminal prosecution if it tends to prove or disprove some disputed or material issue, to illustrate some relevant fact or evidence, or to corroborate or dispute other evidence in the case. Photographs that tend to shed light on, to strengthen, or to illustrate other testimony presented may be admitted into evidence. Kuenzel v. State, 577 So.2d at 474. The admission of photographic or videotape evidence is completely within the sound discretion of the trial court. Stewart v. State; 443 So.2d 1362, 1364
(Ala.Cr.App. 1983). Matters resting in the sound discretion of the trial court will not be disturbed, absent a clear abuse of discretion. Pace v. State; 284 Ala. 585, 226 So.2d 645 (Ala. 1969).
In this case, the State had the burden of proving the aggravating circumstance of murder committed during a robbery. The evidence depicting the crime scene, both photographic and on videotape, helped to establish that aggravating circumstance. We cannot say the trial court clearly abused its discretion in admitting both the photographs and videotapes. There is no plain error here.
 V.
Pilley contends that the trial court's jury instructions on the particularized intent required to convict someone as an accomplice to capital murder were not correct statements of the law, and that thus, those instructions amounted to reversible error. No objection was raised before the trial court to the instructions on the ground asserted on appeal. Thus, we review this argument under the plain error rule. Rule 45A, Ala.R.App.P. In setting out the standard for plain error review of *Page 883 
jury instructions, the court in United States v. Chandler, 996 F.2d 1073,1085, 1097 (11th Cir. 1993), cited Boyde v. California, 494 U.S. 370,380, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990), for the proposition that "an error occurs only when there is a reasonable likelihood that the jury applied the instruction in an improper manner." Williams v. State,710 So.2d 1276 (Ala.Cr.App.), opinion on rehearing, 710 So.2d at 1349
(Ala.Cr.App. 1996), aff'd, 710 So.2d 1350 (Ala. 1997), cert. denied,524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998).
The trial court carefully and correctly instructed the jury on complicity and the particularized intent required to convict an accomplice of capital murder:
 "I charge you, ladies and gentlemen of the jury, that to find the defendant guilty of capital murder by complicity, you must find that he had the specific intent to promote or assist in the killing of another. If you do not find that the defendant acted with the requisite specific intent, you must find the defendant not guilty of the offense of capital murder.
 "And when I say the specific intent to promote or assist in the killing of another, that would have to be the specific intent to promote or assist [in] the killing of two or more persons in the common plan, scheme, and design, as I have described them to you."
(R. 669-70.) In addition, the trial court gave complete, correct instructions on the law of complicity. (R. 660-63.)
The trial court's instructions on the law of complicity and the particularized intent required to convict a defendant of capital murder as an accomplice were correct, and were given in clear and unmistakable language. There is no reasonable likelihood or probability that a juror in this case was, or might have been, mislead by the trial court's instructions. There is no plain error here.
 VI.
Pilley argues that the trial judge erred in improperly charging the jury on the aggravating circumstance that this offense was "especially heinous, atrocious, or cruel" when compared to other capital offenses. However, a review of the record indicates that the trial judge sustained the defense's objection as to that aggravating circumstance and declined to instruct the jury on it. The only two aggravating circumstances presented to the jury were that the capital offense was committed by a person under the sentence of imprisonment, pursuant to § 13A-5-49(1), Ala. Code 1975, and that the capital offense was committed while the defendant was engaged in, or was an accomplice in, the commission of, or an attempt to commit, or flight after committing, or attempting to commit robbery in the first degree, pursuant to § 13a-5-49(4), Ala. Code 1975. Therefore, Pilley's argument is without a basis in the record.
 VII.
Pilley argues that the trial court erred in denying his October 15, 1996, motion for a continuance to allow the Alabama Prison Project to complete its investigation into possible mitigating evidence or additional witnesses. Pilley argues that the trial court's denial of a continuance "played a part" in its subsequent finding that there were no mitigating circumstances.
The record indicates that on September 13, 1996, the trial court granted a request for investigative expenses for the Alabama Prison Project to conduct an investigation into mitigation evidence. In Pilley's request for a continuance, he merely alleged that the Alabama Prison Project could not *Page 884 
complete its investigation by the trial date of December 2, 1996, and he asked for a continuance "until another date convenient with this Court." In a letter from the Alabama Prison Project attached to Puley's motion, the investigator indicated that she wanted to "explore the possibility of learning disorders," to develop "information about what substances Mr. Pilley was exposed to as a child working in a junkyard," and basically to review records and interview potential witnesses. (C. 82-84.) The record also indicates that, although the trial court denied this continuance, the trial in this case did not start on December 2, 1996, but was ultimately continued until April 7, 1997. Pilley never renewed his request for additional time to explore mitigation evidence, nor did he ever provide the Court with a list of specific evidence or witnesses that would require additional time to procure.
The guidelines for determining whether a trial court has abused its discretion in denying a continuance are set out in Ex parte Saranthus,501 So.2d 1256, 1257 (Ala. 1986):
 "`A motion for a continuance is addressed to the discretion of the court and the court's ruling on it will not be disturbed unless there is an abuse of discretion. Fletcher v. State, 291 Ala. 67, 277 So.2d 882
(1973). If the following principles are satisfied, a trial court should grant a motion for continuance on the ground that a witness or evidence is absent: (1) the expected evidence must be material and competent; (2) there must be a probability that the evidence will be forthcoming if the case is continued; and (3) the moving party must have exercised due diligence to secure the evidence. Knowles v. Blue, 209 Ala. 27, 32, 95 So. 481, 485-86 (1923).'"
In the present case, Pilley has failed to make a good-cause showing as to any of the three grounds that could support the granting of a motion for a continuance. He has not revealed to the trial court or this court any specifics concerning any material and competent evidence or witnesses that would have been produced had a continuance been granted. He presented nothing but a list of areas the Alabama Prison Project intended to explore. And in light of the fact that the trial did not commence on December 2, 1996, he has not shown how the trial court's October 1996 denial of a continuance had any effect on the Alabama Prison Project's ability to complete its mitigation investigation before the April 1997 trial. Therefore, Pulley has failed to show that there was a probability that any evidence would have been forthcoming and that he exercised due diligence in securing the evidence. Price v. State; 383 So.2d 884
(Ala.Cr.App. 1997).
"The speculative allegations of counsel regarding the possible existence of potential witnesses or evidence are insufficient to show that the trial judge abused his discretion." Connor v. State;447 So.2d 860, 863 (Ala.Cr.App. 1984).
 VIII.
Pilley argues that the trial court erred in denying his request that he be provided with a transcript of the trial of his codefendant. He argues that, because Andrew Apicella had been tried for the same offense, "based upon the same people, events, and circumstances," it was unfair that Pilley not be provided with a transcript of that proceeding. Pulley acknowledges that this argument has been decided adversely to him in Penn v. State; 539 So.2d 316, 318 (Ala.Cr.App. 1986), but he asks us to revisit our decision in that case. We decline to do so.
In Penn v. State, we held: *Page 885 
 "This precise issue, however, has been previously decided adversely to the appellant. In Mardis v. State, 423 So.2d 331 (Ala.Cr.App. 1982), this court concluded that the trial court's denial of certain pretrial motions was proper, based upon the following reasoning:
 "`The defendant claims that the trial court erroneously denied portions of his "motion for discovery" inquiring about the criminal records of, or the immunity promised to, any of the State's witnesses. He also contends that the court erred by not granting his pretrial "petition for transcript for indigent defendant," in which he sought a copy of the trial transcript of his co-defendant James Meeks.
 "`Both requests were properly denied. The "petition for transcript for indigent defendant" was a discovery device, as indicated by counsel's statement in brief:
 "`"At the trial of James Meeks, the State called witnesses to the stand against Mr. Meeks which were in fact the same witnesses called against appellant at his trial. Appellant requested a transcript of said proceedings in order to assist counsel for appellant in preparation of the case against him."
 "`Section 12-22-190, Alabama Code 1975, authorizes a free transcript only for a convicted defendant for purposes of appeal. See Mayola v. State, 344 So.2d 818
(Ala.Cr.App.), cert. denied, 344 So.2d 822 (Ala. 1977).
 "`There is no constitutional right to discovery in a criminal case. Brown v. State; 401 So.2d 213
(Ala.Cr.App.), cert. denied, 401 So.2d 218 (Ala. 1981). Furthermore, it is within the trial court's discretion to deny disclosure of material which might impeach the credibility of the State's witnesses, see Oliver v. State, 399 So.2d 941
(1981); Mack v. State, 375 So.2d 476 (Ala.Cr.App. 1978), aff'd, 375 So.2d 504 (Ala. 1979), vacated on other grounds, 448 U.S. 903. 100 S.Ct. 3044, 65 L.Ed.2d 1134 (1980). The defendant has shown no abuse of discretion here. Id. at 334."
Penn v. State, 539 So.2d at 318.
Our decision in Penn is consistent with Rule 16.1, Ala.R.Crim.P., which does not expand the scope of discovery in criminal trials to provide a defendant with a transcript of the trial of a codefendant. Rule 16.1(e) specifically states:
 "(e) Information Not Discoverable. Except as provided in (a), (b), and (d), the discovery or inspection of reports, memoranda, witness lists, or other internal state/municipality documents made by the prosecutor or the prosecutor's agents, or by law enforcement agents, in connection with the investigation or prosecution of the case, or of statements made by the state! municipality witnesses, is not authorized."
(Emphasis added.) In essence, by asking for a trial transcript which would contain the testimony of the same witnesses who would be testifying at his trial, Pilley was asking for the statements made by the state witnesses. He was not entitled to that testimony under Rule 16.1.
Here, as in Penn and Mardis, there was no abuse of discretion in the trial court's decision not to provide Pilley with a transcript of his co-defendant's trial.
 IX.
Pilley argues that the trial court erred in removing jurors who had expressed their inability to impose the death penalty. We note that our review of this issue is pursuant to the plain error rule, *Page 886 
because Pilley did not make this argument at trial. Rule 45A, Ala.R.App.P.
The standard for determining whether a prosecutive juror is disqualified from serving in a death penalty case on the basis of the juror's views regarding the death penalty is whether the prospective juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and oath." Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841
(1985). However, Pilley does not challenge the trial court's use of the Wainwright constitutional yardstick in its decision to remove three jurors from the venire. Instead, Pilley argues that opposition to the death penalty is an expression of a valid political belief and that to ask a juror about their personal "political, religious, moral, and ethical beliefs," and to then remove the juror because of those beliefs violates the constitutional rights of the juror, as well as Pilley's constitutional rights.
Pilley makes the general argument that to strike jurors for cause because of their opposition to the death penalty violates the Fifth,Sixth, and Fourteenth Amendments to the United States Constitution and Article 1, Section 6, of the Alabama Constitution of 1901. He fails to specify which provisions he relies upon, nor does he cite any caselaw to support this general argument.
This argument is flawed in several respects. First, the Wainwright standard is not directed at religious or political beliefs; it is a neutral standard designed to ensure that the jurors who decide capital cases are capable of following the law. Religious or political freedoms are not implicated by neutral laws governing activities the government has the right to regulate merely because some religious or political groups may be disproportionately affected. Employment Division v. Smith,494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). The government has the right to expect jurors to follow the law, instead of their own personal beliefs, in capital cases, and prospective jurors who wish to serve on capital juries must be able to do so. Ramos v. State;934 S.W.2d 358, 367 (Tex.Crim.App. 1996), cert. denied, 520 U.S. 1198,117 S.Ct. 1556, 137 L.Ed.2d 704 (1997).
Further, Pilley has produced no evidence that the challenged jurors were members of a political or religious group who oppose the death penalty. Opposition to the death penalty takes many forms and has many reasons, and the sharing of that point of view does not automatically create a group worthy of equal protection under the United States Constitution. As the Supreme Court of California wrote:
 "Persons who would not be willing to vote for the death penalty come from diverse backgrounds and experiences, and may have diverse views on all other matters. Their unwillingness to vote for death may come from many sources: religious conviction, political alignment, moral philosophy, refusal to take such an awesome responsibility, or simply a feeling that `I just couldn't live with it.' They do not comprise a distinctive, self-conscious group; one's identity is defined in part by his or her gender, race, religion, and other matters, but not generally by one's view on the single question of whether one would vote against death if chosen as a juror in a capital case. We conclude that the class of persons united only by their determination to vote automatically against the death penalty — a class divided in all else, including even their reasons for refusing to consider the death penalty — is not a cognizable class under the past *Page 887 
appellate decisions defining that concept."
People v. Fields, 35 Cal.3d 329, 349, 673 P.2d 680, 692, 197 Cal.Rptr. 803,815 (1997). This holding is in line with our decision in Clemons v. State, 720 So.2d 961 (Ala.Cr.App. 1996), aff'd. 720 So.2d 985 (Ala. 1998). In Clemons, we cited Lockhart v. McCree; 476 U.S. 162,106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), in which the United States Supreme Court stated:
 "`"In our view, groups defined solely in terms of shared attitudes that would prevent or substantially impair members of the group from performing one of their duties as jurors, such as the `Witherspoon — excludables' at issue here, are not `distinctive groups' for fair cross-section purposes."
 "Lockhart v. McCree; 476 U.S. at 174, 106 S.Ct. 1758.'
"Johnson v. State; 502 So.2d at 879."
A complete review of the voir dire examination clearly reveals that each challenge based on the juror's inability to consider the death penalty was justified. We particularly note that two unchallenged jurors expressed opposition to the death penalty, but responded to follow-up questions that, while they would find it hard to do, they could consider every option and follow the instructions given to them by the trial court. (R. 147-48, 162-64.) The jurors who were excused were removed based on their expressed inability to follow the law, not based on their religious or political beliefs.
We find no federal or state due process or equal protection violations. The trial court did not err in removing these jurors because of their stated inability to follow the court's instructions.
 X.
Pilley next argues that the death penalty, as it is imposed under the present Alabama statute, violates the Eighth and Fourteenth Amendment to the United States Constitution and violates "the letter and spirit" of the Alabama Constitution of 1901. Without citing any authority for his position, Pilley argues that the death penalty in Alabama is imposed arbitrarily and that it constitutes cruel and unusual punishment.
Alabama's death penalty statutory scheme has been repeatedly upheld against constitutional challenges. A comprehensive listing of the cases dealing with constitutional challenges to the death penalty can be found in Travis v. State; 776 So.2d 819 (Ala.Cr.App. 1997).
 XI.
In reviewing the sentence of death as we are required to do by § 13A-5-53, Ala. Code 1975, we make the following findings: We have searched the record and found no error in the sentencing proceedings adversely affecting Pilley's rights. Pursuant to Rule 45A, Ala.R.App.P., we have searched the entire proceedings under review and found no plain error or defect that has, or probably has, adversely affected any substantial right of Pilley's.
The trial court found the existence of two aggravating circumstances: That the capital offense was committed by a person under sentence of imprisonment, § 13A-5-49(1), and the capital offense was committed during the commission of a robbery in the first degree, § 13A-5-49(4).
The trial court found no mitigating circumstances.
It is the conclusion of this Court that the trial court's findings concerning the aggravating and mitigating circumstances are supported by the record. *Page 888 
As required by § 13A-5-53(b)(3), we must determine whether Pilley's sentence was disproportionate or excessive when compared to the penalties imposed in similar cases. Pilley murdered five people pursuant one course of conduct. Although similar crimes where fewer people were murdered have been punished by the imposition of the death penalty throughout the state, our research of Alabama caselaw has failed to uncover a case where as many as five people were murdered pursuant to one course of conduct. Our comparison of these cases proves how appropriate the imposition of the death penalty was in this case. Williams v. State, 710 So.2d 1276
(Ala.Cr.App.), aff'd, 710 So.2d 1350 (Ala. 1997), cert. denied,524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998) (four deaths); Taylor v. State, 666 So.2d 36 (Ala.Cr.App.), on remand, 666 So.2d 71
(Ala.Cr.App. 1994), aff'd, 666 So.2d 73 (Ala. 1995), cert. denied,516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996) (two deaths); Siebert v. State, 555 So.2d 772 (Ala.Cr.App.), aff'd, 555 So.2d 780
(Ala. 1989), cert. denied, 497 U.S. 1032, 110 S.Ct. 3297, 111 L.Ed.2d 806
(1990) (three deaths); Fortenberry v. State, 545 So.2d 129 (Ala.Cr.App. 1988), aff'd, 545 So.2d 145 (Ala. 1989), cert. denied, 495 U.S. 911,110 S.Ct. 1937, 109 L.Ed.2d 300 (1990) (four deaths); Hill v. State;455 So.2d 930 (Ala.Cr.App.), aff'd, 455 So.2d 938 (Ala.), cert. denied,469 U.S. 1098, 105 S.Ct. 607, 83 L.Ed.2d 716 (1984) (three deaths).
It is the finding of this Court that death is the proper sentence in this case. There is no indication that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor. Our independent weighing of the aggravating and mitigating circumstances indicates that death is the proper sentence. The sentence of death in this case is neither excessive nor disproportionate to the penalty imposed in similar cases, considering both the crime and the appellant.
The judgment of the circuit court is affirmed.
AFFIRMED.
LONG, P.J., and McMILLAN, BROWN and BASCHAB, JJ., concur.
[1] As far as we can determine from the record, there was no state's exhibit 27 or 31.