[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 349 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 350 
The appellant, Michael Craig Maxwell, was indicted for four counts of capital murder in connection with the shooting deaths of Harold Pugh and his 11-year-old son Joey Pugh. The jury found Maxwell guilty of all counts charged in the indictment: two counts of murder made capital because *Page 351 
the killings were committed during the course of a robbery in the first degree, see § 13A-5-40(a)(2), Ala. Code 1975; one count of murder made capital because it involved the murder of two or more persons by one act or pursuant to one scheme or course of conduct, see §13A-5-40(a)(10); and one count of murder made capital because the victim was less than 14 years old, see § 13A-5-40(a)(15). The jury recommended, by a vote of 10-2, that Maxwell be sentenced to death. The trial court accepted the jury's recommendation and sentenced Maxwell to death by electrocution.
On appeal, Maxwell raises numerous issues, most of which he did not raise by objection in the trial court. Because Maxwell was sentenced to death, his failure to object at trial does not bar appellate review of these issues; however, it does weigh against Maxwell as to any claim of prejudice he now makes on appeal. See Dill v. State, 600 So.2d 343
(Ala.Cr.App. 1991), aff'd, 600 So.2d 372 (Ala. 1992), cert. denied,507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993); Kuenzel v. State,577 So.2d 474 (Ala.Cr.App. 1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991).
Rule 45A, Ala.R.App.P., provides:
 "In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."
This court has recognized that "`the plain error exception to the contemporaneous-objection rule is to be "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result."'" Burton v. State, 651 So.2d 641, 645 (Ala.Cr.App. 1993), aff'd, 651 So.2d 659 (Ala. 1994), cert. denied, 514 U.S. 1115,115 S.Ct. 1973, 131 L.Ed.2d 862 (1995), quoting United States v. Young, 470 U.S. 1,15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985) (quoting United States v.Frady, 456 U.S. 152, 163, 102 S.Ct. 1584, 1592, 71 L.Ed.2d 816 (1982)). Accordingly, we will address the issues raised by Maxwell on appeal.
The State's evidence tended to show the following. On July 21, 1997, Harold Pugh and his 11-year old son Joey Pugh were reported missing to the Colbert County Sheriff's Department. Mike Sennett, a friend of the Pughs, testified that in the early evening hours of July 21, after hearing that the Pughs were missing, he and several friends went looking for the Pughs at Cane Creek, in Colbert County. Sennett testified that Harold and his son were avid fishermen and that they fished frequently on Cane Creek and its surrounding areas. The local authorities and a rescue squad were also searching for the Pughs in this same area. Making one more pass up Cane Creek in his boat before going home, Sennett found the bodies of Harold and Joey Pugh floating in the creek. Autopsies revealed that each victim had been shot twice in the head.
Several days later, on July 26, 1997, a boat was found in a clearing in a remote wooded area in neighboring Franklin County. In the boat were rods and reels, a tacklebox, life jackets, a baseball-style cap with a wristwatch inside it (on the boat's front seat), and another cap on the backseat. At Maxwell's trial, the individual who found the boat testified that before finding the green and white boat, he had heard "reports" that a green and white boat was being sought in the investigation of the Pughs' murder. Other testimony at trial showed that a pedestal-type seat had been removed from the boat and that two *Page 352 
spent 9mm shell casings were also found inside the boat.
Further testimony revealed that on the day the victims' bodies were found, two armed men, wearing dark-colored army fatigues, hooded shirts, sunglasses, and gloves, robbed the Deposit Guaranty National Bank in Belmont, Mississippi. An employee at the bank testified that she could not identify the men, but that she was able to identify the truck the men fled in after the robbery. She described the truck as a black Z-71 four-wheel drive pickup truck with a chrome toolbox in the rear bed. Shortly after the robbery, a truck matching that description was found by an officer of the Belmont Police Department five miles from the bank, in a heavily wooded area. The truck, which had been set on fire, was discovered after the police saw the smoke from the fire. On the front passenger-side floorboard of the truck, the police found a pedestal-type seat, which, according to testimony, was typical of the seats found in the front of bass-fishing boats.
Following his arrest, Maxwell gave police a detailed statement admitting his involvement in the robbery and the murders of Harold and Joey Pugh and in the bank robbery in Mississippi. Maxwell told police that he and his four codefendants — Mark Moore, Dale Ferguson, Donald Risley, and Kino Graham — had conspired to rob banks to get money. According to Maxwell, they bought clothing, matching that described by the employee of the bank robbed in Belmont, Mississippi, to wear during the robberies, and Moore sold stock and took out a loan to buy guns, handheld radios, and other items to use in the robberies. Maxwell told police that Moore was the "leader" of the group, but that he was "second in command."
In addition, Maxwell told police that he and the others were to find two cars to use in the Belmont bank robbery by July 20, 1997. According to Maxwell, while he, Ferguson, Graham, and Risley were looking for a car to steal on July 20, they saw the Pughs' truck parked near the boat landing at Cane Creek. Maxwell stated that they waited for approximately 30 minutes for the Pughs to return to their truck. When the Pughs arrived at the landing in their boat, Maxwell said, Harold Pugh got out of the boat and into his truck. Maxwell stated that as Harold was backing the truck down the landing to load the boat onto the trailer, he approached Harold and ordered him and his son back into the boat at gunpoint. Maxwell stated that he and Ferguson got into the boat with the Pughs, and that Risley and Graham waited onshore with the truck. Maxwell stated that he and Ferguson then left in the boat with the victims, heading down creek. According to Maxwell, Ferguson shot Harold Pugh and Maxwell shot Joey Pugh as the boy was crouched over in the boat trying to hide. Maxwell stated that because he thought Harold Pugh was still alive after Ferguson shot him, he shot Harold again. Maxwell stated that Ferguson then shot Joey again. Maxwell stated that he used a 9mm pistol to shoot the victims and that Ferguson used a .357 pistol. Maxwell stated that he threw the victims' bodies from the boat into the water and that he and Ferguson then returned in the boat to the landing, where Graham and Risley were waiting. He stated that he and the others then loaded the boat onto the trailer and drove the Pughs' truck and the boat to a clearing in the woods in Franklin County. Maxwell stated that they found Harold Pugh's wallet in the boat and divided the money inside the wallet among themselves. According to Maxwell, they also took a .22 caliber pistol that was in the boat, as well as a .38 caliber pistol that they found inside the victims' truck. Maxwell stated that Ferguson was afraid that *Page 353 
he had left his fingerprints on the boat seat so he took the seat out of the boat and put it into the victims' truck. After leaving the boat and the truck in the clearing, Maxwell said, he and the men went to Maxwell's apartment, telephoned Mark Moore, and told him to come to the apartment.
In his statement, Maxwell said that everyone agreed to meet back at his apartment at 6:00 a.m. the following morning. At that time, Maxwell said, everyone except Graham (who did not come to the apartment) discussed plans for the robbery of the bank in Belmont, Mississippi. Maxwell stated that he and Risley, who, according to Maxwell, were going to be the ones to go inside the bank, left Maxwell's apartment in Maxwell's car, followed by Moore and Ferguson who were in Moore's truck, and drove to where they had left the victims' truck and boat. From that location, Maxwell said, Risley drove the victims' truck to Belmont, and Maxwell drove his own car, while Moore and Ferguson followed in Moore's truck. Maxwell stated that he and the other men then drove to their "rendezvous point" in Belmont, where they left Maxwell's car. From there, Maxwell said, he and Risley drove the victims' truck to the bank, while Moore and Ferguson, who were to act as "snipers" while the bank was being robbed, followed in Moore's truck. Maxwell stated that after he and Risley committed the robbery, they drove the victims' truck back to the "rendezvous point," where they met Moore and Ferguson, put their guns in Moore's truck, and put the clothes they had worn in the robbery in the victims' truck. According to Maxwell, Risley then poured gasoline on the victims' truck and set it on fire. Maxwell stated that he and the others then returned to his apartment, where they divided the proceeds of the bank robbery — approximately $40,000 — among themselves. Sometime after the robbery and the murders, Moore told Maxwell that the police had come to Moore's house and had taken some guns. Maxwell told the police that this had concerned Moore because one of the guns the police had taken was the 9mm pistol that Maxwell had used to shoot the victims.
Apart from Maxwell's statement to police, there was other evidence at trial indicating that the 9mm pistol police took from Moore's house was the weapon that fired at least one of the bullets recovered from Harold Pugh's body. Evidence was also presented indicating that the two spent shell casings found in the boat had been fired by the 9mm pistol recovered from Moore's house.
There was also testimony that Maxwell, Graham, Ferguson, and Moore had all worked together at the Helig-Meyers Furniture Distribution Center in Russellville, in Franklin County, Alabama. All of the men, except Graham, quit their jobs, or failed to return to work, in the early to middle part of July 1997, just several weeks before the Pughs' murders and the bank robbery. Graham last reported to work on August 20, 1997. Testimony also indicated that on July 22, 1997, the day after the bank robbery in Belmont, Maxwell paid $2,800 in cash for a used pickup truck, using $100 bills.
 I.
Maxwell contends that the trial court erred in denying his motion to suppress his post-arrest statement to the police because, he says, the statement was not voluntarily given. Specifically, he argues that he made the statement after his request for counsel was ignored and "while he was physically, mentally, and emotionally drained." (Maxwell's brief to this court, p. 20.) *Page 354 
Regarding the admissibility of post-arrest statements, we have said:
 "Confessions and inculpatory statements are presumed to be involuntary and inadmissible. Ex parte Callahan, 471 So.2d 463 (Ala. 1985). For a confession to be properly admitted, the State must prove that `"the defendant was informed of his Miranda rights and that the confession was voluntarily given."' Johnson v. State, 680 So.2d 1005, 1007 (Ala.Cr.App. 1996) (quoting Mann v. State, 581 So.2d 22, 23 (Ala.Cr.App. 1991)).
 "`"In determining whether a confession is voluntary, the trial court's finding of voluntariness need only be supported by a preponderance of the evidence. Seawright v. State, 479 So.2d 1362 (Ala.Cr.App. 1985). The trial court's decision will not be disturbed on appeal unless it is manifestly contrary to the great weight of the evidence."'
 "Howard v. State, 678 So.2d 302, 306 (Ala.Cr.App. 1996) (quoting Dixon v. State, 588 So.2d 903, 907 (Ala. 1991))."
 "`"`In reviewing the correctness of the trial court's ruling on a motion to suppress, this Court makes all the reasonable inferences and credibility choices supportive of the decision of the trial court.'" Kennedy v. State, 640 So.2d 22, 26
(Ala.Cr.App. 1993), quoting Bradley v. State, 494 So.2d 750, 761 (Ala.Cr.App. 1985), aff'd, 494 So.2d 772 (Ala. 1986), cert. denied, 480 U.S. 923, 107 S.Ct. 1385, 94 L.Ed.2d 699 (1987). A trial court's ruling on a motion to suppress will not be disturbed unless it is "palpably contrary to the great weight of the evidence." Parker v. State, 587 So.2d 1072, 1088 (Ala.Cr.App. 1991).'"
 "Rutledge v. State, 680 So.2d 997, 1002 (Ala.Cr.App. 1996)."
Maples v. State, 758 So.2d 1, 41 (Ala.Cr.App. 1999). Further, when determining whether a confession is voluntary, a court must consider the totality of the circumstances surrounding the confession. Maples,758 So.2d at 41.
At the suppression hearing, Daniel Girsh, an agent with the F.B.I. in Florence, Alabama, testified that he was present on August 21, 1997, when Maxwell was interviewed at the Colbert County jail. Also testifying at the hearing and also present during the interview were Ronnie May, a captain with the Colbert County Sheriff's Department, and Herbert Smith, a special agent with the F.B.I. The interview began at 11:26 p.m., approximately one hour after Maxwell had turned himself in to the authorities at the Franklin County Sheriff's Office and had been transported to Colbert County for questioning. Maxwell was read hisMiranda warnings by Agent Smith, and he signed a waiver of rights form acknowledging that he understood these rights, that he agreed to waive those rights, and that he wanted to give a statement.
All of the interrogating officers testified that Maxwell was very cooperative in answering their questions. Initially, Maxwell denied any involvement in the Pughs' murders, but shortly into the interview, he admitted his participation in the robbery and the murders. After Maxwell had been questioned for approximately three hours, a tape-recording of his statement was begun at 2:58 a.m. and was concluded at 4:20 a.m.
Maxwell testified at the suppression hearing that, after he was confronted with a list of items found in his apartment linking him to the robbery of a liquor store, he told Agent Smith, "[W]ell, I guess I need a lawyer now." (R. 135.) According to Maxwell, Smith became upset and irate and threw his pen on the table. *Page 355 
Smith also, according to Maxwell, took out of his briefcase written statements of Maxwell's codefendants and threw them on the table. Maxwell further testified that he was tired during the interview because, he claimed, he had had only several hours of sleep in the 48 hours preceding the interrogation. He also testified that he had a severe headache during the interview. Maxwell acknowledged that he never told the investigators that he was too tired to continue the interview; he also acknowledged that when he requested aspirin for his headache, just before making the tape-recorded statement, he was given some by a jailer.
The testimony of the interrogating officers conflicted sharply with that of Maxwell. According to Girsh, May, and Smith, Maxwell never requested an attorney, never complained that he was in pain and unable to continue the interview, and never indicated that he was too tired to finish answering questions. All of the officers also testified that Maxwell was not threatened, coerced, or intimidated into giving a statement, nor was he offered any reward or hope of reward if he cooperated. Smith testified that he did not get angry and throw his pen on the table. May corroborated Smith's testimony, stating that he did not recall Smith's getting upset and throwing his pen on the table. Smith stated that he did take from his briefcase a typed statement from one of Maxwell's codefendants and place it on the table, but he stated that he did not use the statement to threaten or to coerce Maxwell into admitting his involvement in the murders. May testified that when Smith placed the statement on the table, he informed Maxwell only that he had talked with his codefendants; he did not refer to what was contained in the statement nor did he tell Maxwell that the statement was, in fact, a confession by the codefendant implicating Maxwell in the robbery and murders.
After considering the totality of the circumstances, we conclude that Maxwell's statement was made knowingly and voluntarily. As we stated above, there was no testimony from the interrogating officers that Maxwell appeared to be exhausted or emotionally distressed to the point of being unable to voluntarily waive his rights and give a statement. In fact, at no point in the interview, according to the officers, did Maxwell indicate that he was too tired to answer more questions or that he was in too much pain to continue. When Maxwell complained of a headache, he was given aspirin. Whether Maxwell was, as he claims, "physically, mentally, and emotionally drained" was merely one factor to be considered by the trier of fact in determining the credibility and weight to afford Maxwell's statement. See Jackson v. State,674 So.2d 1318, 1327 (Ala.Cr.App. 1993), aff'd in part, rev'd in part,674 So.2d 1365 (Ala. 1994), on return to remand, 674 So.2d 1370
(Ala.Cr.App. 1995).
Maxwell's testimony that his request for an attorney during interrogation was denied conflicted with the testimony of the interrogating officers, all three of whom testified that Maxwell never mentioned an attorney, and that he did not request one.
 "`Where the evidence of voluntariness is conflicting, and even where there is credible testimony to the contrary, the trial judge's finding of voluntariness must be upheld unless palpably contrary to the weight of the evidence. Ash v. State, 424 So.2d 1381, 1385 (Ala.Cr.App. 1982)' Whisenant v. State, 466 So.2d [995], 1001 [(Ala.Cr.App. 1984)]. The trial judge has a duty to resolve questions of fact regarding the voluntariness of a confession when presented with conflicting evidence on that issue. See Ex parte Johnson, [522 So.2d 234 (Ala. 1988)]; Sales v. State, 432 So.2d 560 *Page 356 
(Ala.Cr.App. 1983). A finding of voluntariness need be supported only by a preponderance of the evidence. Jackson v. State, [516 So.2d 726 (Ala.Cr.App. 1985)].'"
Carr v. State, 545 So.2d 820, 824 (Ala.Cr.App. 1989).
Considering the totality of the circumstances, we do not find the trial court's determination of voluntariness to be palpably contrary to the great weight of the evidence. Thus, we hold that the trial court did not err in denying Maxwell's motion to suppress his statement and in admitting the statement at trial.
 II.
Maxwell contends that the trial court erred in denying his motion for a judgment of acquittal because, he says, the State's evidence was insufficient to sustain his convictions for capital murder.
 "`"In reviewing the sufficiency of the evidence the appellate courts of this State are bound by several well settled rules. It is not the function of this Court to decide whether the evidence is believable beyond a reasonable doubt and to a moral certainty. Instead, the function of this Court is to determine whether there is legal evidence from which a jury could by fair inference find the defendant guilty. Cumbo v. State, 368 So.2d 871 (Ala.Cr.App.), cert. denied, 368 So.2d 877 (Ala. 1979); Scruggs v. State, 359 So.2d 836, 842 (Ala.Cr.App.), cert. denied, 359 So.2d 843 (Ala. 1978).
 "`"In determining the sufficiency of the evidence to sustain the conviction, this Court must accept as true the evidence introduced by the State and accord the State all legitimate inferences therefrom. Ellis v. State, 338 So.2d 428 (Ala.Cr.App. 1976); Edson v. State, 53 Ala. App. 460, 301 So.2d 226 (1974). The evidence must be considered in the light most favorable to the prosecution. Colston v. State, 57 Ala. App. 4, 325 So.2d 520, [1975] cert. denied, 295 Ala. 398, 325 So.2d 531 (197[6]).
 "`"Where there is legal evidence from which the jury can by fair inference find the defendant guilty, this Court has no right to disturb the verdict. Bell v. State, 339 So.2d 96 (Ala.Cr.App. 1976). A verdict of conviction will not be set aside on the ground of insufficiency of the evidence, unless, allowing all reasonable presumptions for its correctness, the preponderance of the evidence against the verdict is so decided as to clearly convince this Court that it was wrong and unjust. Bridges v. State, 284 Ala. 412, 225 So.2d 821 (1969); Morton v. State, 338 So.2d 423
(Ala.Cr.App. 1976)."'
 "Freeman v. State, 505 So.2d 1079 (Ala.Cr.App. 1986), quoting, Johnson v. State, 378 So.2d 1164, 1169
(Ala.Cr.App. 1979), writ quashed by Ex parte Johnson, 378 So.2d 1173 (Ala. 1979)."
Anderson v. State, 542 So.2d 292, 295-96 (Ala.Cr.App. 1987), quoted inBankhead v. State, 585 So.2d 97, 104 (Ala.Cr.App. 1989), aff'd in part, remanded, 585 So.2d 112 (Ala. 1991), aff'd on return to remand,625 So.2d 1141 (Ala.Cr.App. 1992), rev'd on unrelated grounds,625 So.2d 1146 (Ala. 1993), and quoted with approval in Pilley v. State,789 So.2d 870, 875-76 (Ala.Cr.App. 1998).
Maxwell advances two arguments concerning the sufficiency of the State's evidence; we address each argument separately.
 A.
First, Maxwell contends that the trial court erred in denying his motion for a *Page 357 
judgment of acquittal because, he says, the evidence was insufficient to support his conviction for the capital offense of murder during the course of a robbery. See § 13A-5-40(a)(2), Ala. Code 1975. Specifically, Maxwell argues that the only evidence presented by the State indicating that a robbery occurred was his confession. Thus, he concludes, the State failed to establish the corpus delicti of the capital offense of murder during a robbery, independent of his confession; therefore, he says, the evidence was insufficient to support his convictions. We do not agree.
It has been the rule in Alabama that the State must offer independent proof of the corpus delicti of the charged offense to authorize the admission of a defendant's confession or inculpatory statement. Robinsonv. State, 560 So.2d 1130, 1135-36 (Ala.Cr.App. 1989); see C. Gamble,McElroy's Alabama Evidence, 200.13 (5th ed. 1996). "`The corpus delicti consists of two elements: "(1) That a certain result has been produced, . . . and (2) that some person is criminally responsible for the act.'"Johnson [v. State, 473 So.2d 607, 608 (Ala.Cr.App. 1985),] (quoting C. Gamble, McElroy's Alabama Evidence § 304.01 (3d ed. 1977))." Spearv. State, 508 So.2d 306, 308 (Ala.Cr.App. 1987).
"`Positive, direct evidence of the corpus delicti is not indispensable to the admissions of confessions.'" Bracewell v. State, 506 So.2d 354, 360
(Ala.Cr.App. 1986), quoting Ryan v. State, 100 Ala. 94, 14 So. 868
(1894). "The corpus delicti may be established by circumstantial evidence." Sockwell v. State, 675 So.2d 4, 21 (Ala.Cr.App 1993), aff'd,675 So.2d 38 (Ala. 1995), cert. denied, 519 U.S. 838, 117 S.Ct. 115,136 L.Ed.2d 67 (1996).
 "`Independent evidence of the corpus delicti need not be of such probative strength as that such evidence, standing alone, in the opinion of the trial or appellate court, would, ought to or probably would satisfy a jury beyond a reasonable doubt of the existence of the corpus delicti. Independent evidence of the corpus delicti may consist solely of circumstantial evidence. Whether the independent evidence tending to prove the corpus delicti is sufficient to warrant a reasonable inference of the existence thereof depends, of course, upon the particular facts of each case.'"
Bush v. State, 695 So.2d 70, 117 (Ala.Cr.App. 1995), aff'd, 695 So.2d 138
(Ala. 1997), cert. denied, 522 U.S. 969, 118 S.Ct. 418, 139 L.Ed.2d 320
(1997), quoting C. Gamble, McElroy's Alabama Evidence § 304.01 (4th ed. 1991) (footnotes omitted in Bush); see also Howell v. State,571 So.2d 396 (Ala.Cr.App. 1990). "The presentation of facts, from which the jury may reasonably infer that the crime charged was committed, requires the submission of the question to the jury." Watters v. State,369 So.2d 1262, 1272 (Ala.Cr.App. 1978), rev'd on other grounds,369 So.2d 1272 (Ala. 1979).
Further, it is well settled that
 "`inconclusive facts and circumstances tending prima facie to show the corpus delicti may be aided by the admissions or confession of the accused so as to satisfy the jury beyond a reasonable doubt, and so to support a conviction, although such facts and circumstances, standing alone, would not thus satisfy the jury of the existence of the corpus delicti.'"
Bush, 695 So.2d at 117-18, quoting Bridges v. State, 284 Ala. 412, 417,225 So.2d 821, 826 (1969); see also Bracewell, 506 So.2d at 360; Spear, 508 So.2d at 308. "While a confession is inadmissible as prima facie proof of the corpus delicti, it can be used along with other evidence to satisfy the jury of the existence of the corpus delicti." Bracewell, supra at 360; see also *Page 358 Howell, 571 So.2d at 397. As Professor Gamble has observed:
 "The purpose of requiring proof of the corpus delicti, as a condition precedent to the admission of a confession, is to insure its trustworthiness. For this reason, there is some judicial language to the effect that corroborative evidence independent of the confession need not be sufficient to establish corpus delicti but must be sufficient independent evidence which would tend to establish the trustworthiness of the confession."
McElroy's Alabama Evidence, § 200.13 at 100 (5th ed. 1996). Finally, we have held:
 "`Evidence of facts and circumstances, attending the particular offense, and usually attending the commission of similar offenses — or of facts to the discovery of which the confession has led, and which would not probably have existed if the offense had not been committed — would be admissible to corroborate the confession. The weight which would be accorded them, when connected with the confession, the jury must determine, under proper instructions from the court.'"
Bush, supra at 118, quoting Matthews v. State, 55 Ala. 187, 194 (1876); see also Bracewell, supra.
Applying the foregoing principles of law to the facts of this case, we conclude that although the evidence concerning the facts and circumstances surrounding the offense may be inconclusive without Maxwell's confession, "they do tend to prima facie show the corpus delicti of a robbery." See Bush, supra at 119. When Maxwell's confession is used as an aid in determining the corpus delicti, the evidence is more than sufficient to establish the corpus delicti of the capital offense of murder during a robbery. Id.
The circumstantial evidence presented by the State tended to show that the Pughs had been fishing on the day of their murders, that they had been killed in their boat, and that their bodies had been dumped in Cane Creek. Although there was no direct testimony that the Pughs had gone fishing on the day of their murders, other testimony showed that they were avid fishermen and that they frequently fished on and around Cane Creek. The jury was shown a photograph of the Pughs standing in front of their boat while they were alive and photographs of the boat as it was found in the woods after the murders; a comparison of these photographs could lead a jury to reasonably conclude that it was the same boat, and thus, that the boat found in the woods belonged to the Pughs. Further, the truck found in Mississippi, which was identified as matching the description of the truck driven by the bank robbers, was linked to the boat because a pedestal-type seat, consistent with the type of seat typically found in a fishing boat, was found in the front seat of the truck. This, combined with the fact that a pedestal-type seat was missing from the boat found in Franklin County, sufficiently linked the Pughs to the truck found in Mississippi. Also, the spent shell casings found in the boat were identified as having been fired from a gun found in the house of one of Maxwell's codefendants, whom Maxwell had worked with shortly before the murders. There was evidence indicating that the same gun fired at least one of the bullets removed from Harold Pugh's body. Additionally, Maxwell was reported to have been in possession of a large amount of money shortly after the murders and the robbery of the bank in Belmont.
It is undisputed that Harold and Joey Pugh were murdered, that their assailant used force to overcome their physical resistance, and that their deaths were caused by a deadly weapon. We also find that *Page 359 
from the facts and circumstances surrounding the murders, Maxwell's intent to commit a theft can be reasonably inferred from the evidence. Obviously, the Pughs were murdered so that either their boat and/or their truck could be stolen. Because the evidence showed that the Pughs were killed in their boat, because the boat was found some distance from Cane Creek, and because a truck with an Alabama license plate found in Mississippi was shown to be linked to the boat, it could be reasonably inferred that the Pughs were murdered to effect the taking of their boat and/or their truck.
We find that the facts of this case, and the reasonable inferences from those facts, support and corroborate Maxwell's confession. Thus, we find that the state sufficiently proved the corpus delicti of the capital offense and established a prima facie case of the capital offense of murder during a robbery that warranted submission of the case to the jury.
In a similar argument, Maxwell contends that because the State failed to establish the corpus delicti of the capital offense of murder during a robbery, the trial court erred in finding the robbery as the sole aggravating circumstance to support the death sentence. This issue is presented for the first time on appeal; thus, we will review it pursuant to the plain-error rule. Rule 45A, Ala.R.App.P. Because we have already held that the State properly established the corpus delicti of the capital offense of murder during a robbery, this claim is without merit.
Maxwell also contends that even if his statement was voluntarily given (and we have determined that it was, see Part I of this opinion), the trial court nonetheless erred in admitting that portion of his statement concerning the robbery of the Pughs. This issue is presented for the first time on appeal; therefore, our review will be for plain error. Rule 45A, Ala.R.App.P. According to Maxwell, his confession provided the only evidence indicating that a robbery had occurred; therefore, he concludes, that portion of his statement concerning the robbery should have been excluded. Because we have already found that the State presented sufficient evidence, independent of Maxwell's confession, to establish the corpus delicti of the capital offense of murder committed during a robbery, this issue is likewise without merit.
 B.
Maxwell also contends that the trial court erred in denying his motion for a judgment of acquittal because, he says, the evidence was insufficient to sustain his conviction for the murder of a child less than 14 years old. See § 13A-5-40(a)(15), Ala. Code 1975. Specifically, he argues that because the State did not present "a birth or death certificate" or "testimony by a parent attesting to the child's date of birth," the evidence was insufficient to establish that Joey Pugh was under 14 years of age at the time of his murder. (Maxwell's brief to this court, p. 11.) We disagree.
Contrary to Maxwell's contention, "`[t]here is no requirement that the proof of . . . age be established by direct, as contrasted with circumstantial, evidence.'" Houston v. State, 565 So.2d 1263, 1264
(Ala.Cr.App. 1990), quoting Hawkins v. State, 549 So.2d 552, 556
(Ala.Cr.App. 1989). In Barnett v. State, 488 So.2d 24 (Ala.Cr.App. 1986), we stated:
 "`It is uniformly the rule that a defendant's [or victim's] physical appearance may be considered by the jury in determining his or her age.' State v. Lauritsen, 199 Neb. 816, 819, 261 N.W.2d 755, 757
(1978); Torres v. State, 521 P.2d 386 (Alaska 1974); State v. Hemmenway, *Page 360 80 S.D. 153, 120 N.W.2d 561 (1963); Ham v. State, 156 Ala. 645, 47 So. 126 (1908); Black v. Pate, 130 Ala. 514, 30 So. 434 (1900). `Jurors are at liberty to use their senses of observation and draw inferences as to the age of an accused or witness from his physical appearance, and such will fill the evidentiary void otherwise present where no verbal or written testimony of age is introduced into evidence.' State v. Rowe, 238 A.2d 217, 222 (Me. 1968); State v. Fries, 246 Wis. 521, 17 N.W.2d 578 (1945); State v. Dorathy, 132 Me. 291, 170 A. 506 (1934); 2 Wigmore, Evidence § 222 (Chadbourn rev. 1979) (`Experience teaches us that corporal appearances are approximately an index of the age of their bearer, particularly for the marked extremes of old age and youth.').
 "It is generally held, however, that some additional proof of the defendant's [or victim's] age must be presented in conjunction with his physical appearance. State v. Lauritsen, 199 Neb. at 819, 261 N.W.2d at 757; Slocum v. People, 120 Colo. 86, 207 P.2d 970 (1949). This additional proof may be in the form of circumstantial evidence and need not be, in and of itself, conclusive of the defendant's [or victim's] age. State v. Fries, 246 Wis. 521, 17 N.W.2d 578
(1945); People v. D'Angelo, 30 Ill. App.3d 86, 333 N.E.2d 525 (1975)."
488 So.2d at 24-25.
Here, the State presented sufficient evidence, albeit circumstantial, to establish that Joey Pugh was under 14 years of age at the time of his murder. The State introduced several autopsy photographs of Joey Pugh and several photographs of Joey while he was still alive, taken shortly before his murder. In addition, Dr. Joseph Embry, the forensic pathologist who performed the autopsy on Joey Pugh, testified that, at the time of the autopsy, Joey Pugh weighed 66 pounds and was approximately four feet nine inches tall. Dr. Embry further testified that the child's appearance was "consistent with the reported age of eleven years." (R. 636.) The photographs of Joey Pugh, which allowed the jurors to use their "senses of observation" to draw inferences as to his age, combined with Dr. Embry's testimony, was sufficient to establish that Joey Pugh was under the age of 14 at the time of his death. Accordingly, the trial court properly denied Maxwell's motion for a judgment of acquittal and submitted the issue to the jury.
 III.
Maxwell contends that the trial court erred in overruling his objection seeking to exclude what he says was a "nonresponsive answer of a State's witness on cross-examination." (Maxwell's brief to this court, p. 7.) Maxwell's objection is based on the following testimony, which took place during Maxwell's cross-examination of Oscar Hood, a sergeant with the Colbert County Sheriff's Department who was involved in the investigation of the Pughs' murders:
 "[Defense counsel]: Okay. Now, explain to us again —
"By the Court: Now, you need to speak up a little bit, please.
"[Hood]: All right.
 "[Defense counsel]: What was your purpose, as you understood it, for being there with the boat?
 "[Hood]: Okay. My purpose was I had received a phone call concerning the boat and we went there.
"[Defense counsel]: All right.
 "[Hood]: And I got the numbers off the boat and called them in to verify ownership, and it was Mr. Pugh's boat.
 "[Defense counsel]: Well, I object, Your Honor, and I ask that that *Page 361 
answer be stricken. He just made a voluntary statement as to who the boat belonged to. I didn't ask him that.
"[Hood]: You asked.
"[Defense counsel]: No, I didn't.
 "By the Court: Wait just a minute. Y'all don't get into an argument. Overrule objection.
"[Defense counsel]: Ma'am?
"The Court: Overrule objection.
 "[Defense counsel]: Well, let me state my grounds, Your Honor. I didn't —
"The Court: Okay.
 "[Defense counsel]: Well, the proper predicate has not been laid for the identification of the boat, and I did not ask him to identify the boat. I object to that on those grounds."
(R. 577-79.)
On appeal, Maxwell contends that Hood gave an nonresponsive answer when he "volunteered the name of the owner of the boat." (Maxwell's brief to this court, p. 8.) Quoting Rule 611(a) of the Alabama Rules of Evidence, Maxwell states that the "court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to make the interrogation and presentation effective for the ascertainment of the truth." (Maxwell's brief to this court, p. 8.) He argues that "in order to promote the truth, any nonresponsive answer that is allowed into the record jeopardizes the goal of the court" and, therefore, the court has a "duty to exclude any answer which is unresponsive to the question asked." (Maxwell's brief to this court, p. 8.)
We are not convinced that Hood's answer to Maxwell's trial counsel's question was nonresponsive. "The fact that the answer was not anticipated does not automatically make it non-responsive." Howell v.State, 443 So.2d 1326, 1328 (Ala.Cr.App. 1983); see also Marty v. State,656 So.2d 416, 421 (Ala.Cr.App 1994). Defense counsel's question — "What was your purpose, as you understood it, for being there with the boat?" — was the "type of question that would naturally elicit an explanation from a witness." Howell, 443 So.2d at 1328. Further, on direct examination, just before the complained-of answer given on cross-examination, Hood testified, without stating whom the boat belonged to, that he was responsible for protecting the scene where the boat had been found and that he had gotten the identification numbers off the boat and verified the ownership of the boat. For defense counsel then to immediately ask Hood such a general, open-ended question — to explain again his "purpose" for being at the scene where the boat was found — indicated that counsel was either not satisfied with Hood's explanation on direct examination or wanted Hood to provide more information.
Even assuming, for the sake of argument, that the answer was nonresponsive, Maxwell has not attempted to show how he was prejudiced as a result of Hood's testimony that Harold Pugh was the owner of the boat. The circumstantial evidence presented at trial indicated that the Pughs had been fishing in the boat just prior to their murders, that they were killed in the boat, and that their bodies were thrown from the boat into Cane Creek. Further, the jury was specifically instructed that in order to find Maxwell guilty of the capital offense of murder committed during a robbery, it must find that the theft underlying the robbery was a theft of the Pughs' truck, not the boat. Although there was no direct testimony identifying the owner of the truck, the evidence, excluding Hood's answer that the boat belonged to the Pughs, was more than sufficient to link the Pughs to both the boat and the truck. The jury was *Page 362 
shown a photograph of Harold and Joey Pugh taken before their murders standing in front of their boat and was also shown photographs of the boat found abandoned in the woods after the murders; a comparison of these photographs indicated that the boat the Pughs were standing in front of was the same boat found in the woods. Further, the two spent shell casings found in the boat were determined to have been fired from a gun found at the house of one of Maxwell's codefendants. That same gun was positively identified as having fired at least one of the bullets removed from the victims' bodies. Also, missing from the boat when it was found in the woods was a pedestal-type seat, the same type of seat found in the truck after it was burned in the woods in Mississippi. Also, Maxwell admitted in his statement to police that he approached the Pughs as they were preparing to load the boat onto the trailer. Maxwell told police that he ordered the Pughs back into their boat at gunpoint. Based on the foregoing facts, we are unable to find any harm or prejudice to Maxwell as a result of Hood's testimony. Accordingly, we find no error as to this claim.
 IV.
Maxwell further contends that the trial court abused its discretion when it admitted into evidence photographs of the Pughs' bodies as they were found at the crime scene and after they had been removed from the creek, and autopsy photographs of the Pughs. Maxwell concedes that "some of the photographs were properly admitted to prove the cause of death of the victims," yet he argues, without specifying which photographs he is referring to, that the photographs were "repetitious, duplicitous, and offered solely to inflame the jury." (Maxwell's brief to this court, p. 28.) He maintains "that these photographs were not offered to prove or disprove any relevant fact. The fact that both victims had been shot and died as a result of being shot had been established and was not in dispute." (Maxwell's brief to this court, p. 29.) (Emphasis added.)
 "Photographic evidence is admissible in a criminal prosecution if it tends to prove or disprove some disputed or material issue, to illustrate some relevant fact or evidence, or to corroborate or dispute other evidence in the case. Photographs that tend to shed light on, to strengthen, or to illustrate other testimony presented may be admitted into evidence. Chunn v. State, 339 So.2d 1100, 1102
(Ala.Cr.App. 1976). To be admissible, the photographic material must be a true and accurate representation of the subject that it purports to represent. Mitchell v. State, 450 So.2d 181, 184
(Ala.Cr.App. 1984). The admission of such evidence lies within the sound discretion of the trial court. Fletcher v. State, 291 Ala. 67, 277 So.2d 882, 883
(1973); Donahoo v. State, 505 So.2d 1067, 1071
(Ala.Cr.App. 1986) (videotape evidence). Photographs illustrating crime scenes have been admitted into evidence, as have photographs of victims and their wounds. E.g., Hill v. State, 516 So.2d 876
(Ala.Cr.App. 1987). Furthermore, photographs that show the external wounds of a deceased victim are admissible even though the evidence is gruesome and cumulative and relates to undisputed matters. E.g., Burton v. State, 521 So.2d 91 (Ala.Cr.App. 1987). Finally, photographic evidence, if relevant, is admissible even if it has a tendency to inflame the minds of the jurors. Hutto v. State, 465 So.2d 1211, 1212 (Ala.Cr.App. 1984)."
Ex parte Siebert, 555 So.2d 780, 783-84 (Ala. 1989), cert. denied,497 U.S. 1032, 110 S.Ct. 3297, 111 L.Ed.2d 806 (1990). This court has held that autopsy photographs, *Page 363 
although gruesome, are admissible to show the extent of a victim's injuries. See Dabbs v. State, 518 So.2d 825, 829 (Ala.Cr.App. 1987).
Here, the photographs in question depicted matters that were relevant and material to the issues in Maxwell's case, and they corroborated the trial testimony. "The fact that a photograph is gruesome and ghastly is no reason to exclude it from the evidence, so long as the photograph has some relevancy to the proceedings, even if the photograph may tend to inflame the jury." Bankhead v. State, 585 So.2d 97, 109-10 (Ala.Cr.App. 1989), remanded on other grounds, 585 So.2d 112 (Ala. 1991), aff'd on return to remand, 625 So.2d 1141 (Ala.Cr.App. 1992), rev'd, 625 So.2d 1146
(Ala. 1993). "The state had the burden of proving that the victim was dead, and [these photographs were] direct evidence on that point."Jenkins v. State, 627 So.2d 1034, 1045 (Ala.Cr.App. 1992), aff'd,627 So.2d 1054 (Ala. 1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1388,128 L.Ed.2d 63 (1994).
The photographs were admissible because they were relevant to show the crime scene and the injuries each victim suffered, and because they helped to illustrate the testimony given by the investigating officers concerning the crime scene, as well as to illustrate the testimony of the coroner concerning the type and extent of the wounds that caused the victims' deaths.
Applying the legal principles set out above to the facts of this case, we conclude that the trial court did not abuse its discretion in admitting the photographs into evidence.
 V.
Relying on Booth v. Maryland, 482 U.S. 496, 107 S.Ct. 2529,96 L.Ed.2d 440 (1987), Maxwell contends that the trial court erred in allowing victim-impact testimony at the sentencing phase of his trial. He argues that testimony concerning the impact of the victims' deaths on their friends and family and on the community, and concerning their characters, was "illegal, immaterial and highly prejudicial," and was "calculated to inflame and enrage the jury." (Maxwell's brief to this court, p. 23.) Because Maxwell did not properly object to the admission of the victim-impact testimony at trial (the claim was first presented to the trial court in his motion for a new trial), our review will be for plain error. Rule 45A, Ala.R.App.P. There is no merit to Maxwell's claim.
As we stated in Trawick v. State, 698 So.2d 151 (Ala.Cr.App. 1995), aff'd, 698 So.2d 162 (Ala. 1997), cert. denied, 522 U.S. 1000,118 S.Ct. 568, 139 L.Ed.2d 408 (1997):
 "This issue has been resolved by the United States Supreme Court in Payne v. Tennessee, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). This court in Hutcherson v. State, 677 So.2d 1174 (Ala.Cr.App. 1994) citing Payne, stated the following:
 "`"Just over a year ago, the United States Supreme Court held that a prosecutor may present and argue evidence relating to the victim and the impact of the victim's death on the victim's family in the penalty phase of a capital trial. Payne v. Tennessee, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). Payne overruled Booth v. Maryland, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), which had prohibited the introduction of such evidence at the penalty phase, and South Carolina v. Gathers, 490 U.S. 805, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989), which had prohibited the argument of such evidence at the penalty phase. The Court's decision in *Page 364 Payne was based in large measure on the premise that this type evidence related to the harm done by the defendant and, consequently, was a valid consideration in determining the punishment to be imposed. The Court also noted that, in fairness to the State, it was necessary to allow the prosecutor to rebut, to some extent, the wide variety of mitigation evidence that can be offered at the penalty phase by a capital defendant. 501 U.S. at 824-28, 111 S.Ct. at 2608-09."'"
698 So.2d at 160-61, quoting Hutcherson v. State, 677 So.2d 1174, 1200-01
(Ala.Cr.App 1994), rev'd on other grounds, 677 So.2d 1205 (Ala. 1996), cert. denied, 527 U.S. 1024, 119 S.Ct. 2371, 144 L.Ed.2d 775 (1999); see also Hutcherson v. State, 727 So.2d 846, 855-56 (Ala.Cr.App. 1997), aff'd, 727 So.2d 861 (Ala. 1998).
The testimony presented by the State at the penalty phase of Maxwell's trial concerning the character of the victims and the impact of the victims' deaths on friends and family and on the community was proper. Neither of the two penalty-phase victim-impact witnesses testified concerning their characterizations of the crime or the defendant, or concerning what they thought was the appropriate sentence.
Accordingly, we find no error, plain or otherwise, as to this claim.
In a related argument, Maxwell contends that the trial court erred in "upholding the jury's recommended sentence of death, when that recommendation was based on irrelevant victim-impact testimony." (Maxwell's brief to this court, pp. 26-27.) This claim, like Maxwell's previous claim, was presented to the trial court for the first time in Maxwell's motion for a new trial; therefore, our review will be for plain error. Rule 45A, Ala.R.App.P.
Because, as we stated above, the victim-impact testimony challenged on appeal was properly before the jury and the trial court at the sentencing phase of Maxwell's trial, this claim is likewise without merit.
 VI.
Maxwell contends that the trial court erred in giving a supplemental instruction to the jury after the jury had indicated that it was deadlocked during its deliberations at the sentencing phase of the trial. Maxwell did not object to the trial court's supplemental charge; therefore, we will review this claim pursuant to the plain-error rule. Rule 45A, Ala.R.App.P.
The record shows that approximately an hour and a half after the jury began its deliberations at the sentencing phase of the trial, the following occurred:
 "By The Court: Let the record show that the jury has returned to the courtroom. And members of the jury, I'm sorry to hear that you're unable to reach a verdict. But I do want to tell you that the Court cannot release you at this time, and I'm not going to release you at this time. You should make further efforts to arrive at a verdict.
 "Each juror is entitled to his or her opinion of the evidence, but I know that you do not wish to put the State to the expense of another trial if it can be avoided. If you cannot reach a verdict, a mistrial would be declared, and the case would have to be tried again. And there is no reason to believe that another jury would have better or clearer evidence than has been presented to you. This does not mean that you should surrender an honest conviction as to the weight or the effect of any evidence solely because of the opinion of other jurors or because of the importance of arriving at a decision, but you *Page 365 
should give respectful consideration to each other's views and talk over any differences of opinion in a spirit of fairness and candor. If possible, you should resolve any differences and come to a conclusion so that the case may be completed. I will be happy to give you any explanatory charge with respect to the law, and if you should have any questions with respect to the law, you would need to reduce it to writing, knock on the door and all come out here, and I will be glad to give you any explanatory charge about the law that you should — if you should desire one.
 "It is natural that differences of opinion will arise. When they do, each juror should not only express his or her opinion, but the facts and the reasons upon which he or she bases that opinion. By reasoning the matter out, it may be possible for jurors to reach a verdict.
 "What I've said to you must not be taken as an attempt on the part of the Court to require you to surrender your honest and reasonable convictions founded upon the law and the evidence in this case. My sole purpose is to impress upon your duty under your oath and the desirability and importance of reaching a verdict if you can conscientiously do so. Remember that if you have any question about the law, you may come back and ask that, but you would have to reduce it to writing and I would have to look at it with the attorneys before I could answer that.
"You may retire and continue your deliberations."
(R. 1085-87.) The jury returned, although the record does not indicate at what time, with a 10-2 recommendation for the death penalty.
Generally, Maxwell contends that the trial court's charge was "coercive and censorious." (Maxwell's brief to this court, p. 31.) Specifically, he contends that the charge was misleading because, he says, "it could be interpreted by the jury to mean that if [it] did not reach a decision as to punishment, a mistrial could be declared and the entire trial process, including the guilt phase, would be held for naught and a new trial would be required." (Maxwell's brief to this court, pp. 30-33.)
We do not believe, as Maxwell contends, that the trial court's supplemental charge was "coercive and censorious."
 "`"The general rule in Alabama has been that it is not improper for the trial court to urge upon the jury the duty of attempting to reach an agreement or verdict as long as the judge does not suggest which way the verdict should be returned.'" King v. State, 574 So.2d 921, 927-28 (Ala.Cr.App. 1990), quoting McMorris v. State, 394 So.2d 392 (Ala.Cr.App 1980), cert. denied, 394 So.2d 404 (Ala. 1981), cert. denied, 452 U.S. 972, 101 S.Ct. 3127, 69 L.Ed.2d 983
(1981). An Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed.2d 528 (1986), charge, also known as a `dynamite charge,' is permissible if the language of the charge is not coercive or threatening. Grayson v. State, 611 So.2d 422, 425 (Ala.Cr.App. 1992); King v. State, 574 So.2d at 928."
Gwarjanski v. State, 700 So.2d 357, 360 (Ala.Cr.App. 1997).
Further, "[w]hether an `Allen charge' is coercive must be evaluated in the `whole context' of the case." Miller v. State, 645 So.2d 363, 366
(Ala.Cr.App. 1994). In its supplemental instruction, the trial court in no way suggested what sentencing verdict should be returned, nor did the trial court use "coercive or threatening" language. In the context of the entire trial, the charge simply was not "coercive and censorious" as Maxwell suggests. *Page 366 
As to Maxwell's claim that the trial court's supplemental instruction was misleading, we find that the portion of the instruction specifically complained of on appeal — the trial court's statement that "[i]f you cannot reach a [sentencing] verdict, a mistrial would be declared, and the case would have to be retried again" — while not an entirely accurate statement of the law, was not so misleading as to constitute plain error.
In Hyde v. State, 778 So.2d 199 (Ala.Cr.App. 1998), we stated the following regarding plain-error review:
 "`The Alabama Supreme Court has adopted federal case law defining plain error, holding that "`plain error' only arises if the error is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings." Ex parte Womack, 435 So.2d 766, 769 (Ala.), cert. denied, 464 U.S. 986, 104 S.Ct. 436, 78 L.Ed.2d 367
(1983) (quoting United States v. Chaney, 662 F.2d 1148, 1152 (5th Cir. 1981)).'
 "Haney v. State, 603 So.2d 368, 392 (Ala.Cr.App. 1991), aff'd, 603 So.2d 412 (Ala. 1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993)."
To rise to the level of plain error, the claimed error must not only seriously affect a defendant's "substantial rights," but it must also have an unfair prejudicial impact on the jury's deliberations. UnitedStates v. Young, 470 U.S. 1, 16-17 n. 14, 105 S.Ct. 1038, 1047 n. 14,84 L.Ed.2d 1, 13 n. 14 (1985). This court has recognized that "`the plain error exception to the contemporaneous-objection rule is to be "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result."'" Burton v. State, 651 So.2d 641, 645
(Ala.Cr.App. 1993), aff'd, 651 So.2d 659 (Ala. 1994), cert. denied,514 U.S. 1115, 115 S.Ct. 1973, 131 L.Ed.2d 862 (1995), quoting UnitedStates v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1
(1985) (quoting United States v. Frady, 456 U.S. 152, 163,102 S.Ct. 1584, 1592, 71 L.Ed.2d 816 (1982)). A failure to object will weigh heavily against a claim of prejudice. Williams v. State, 601 So.2d 1062,1066 (Ala.Cr.App. 1991), aff'd, 662 So.2d 929 (Ala.), cert. denied,506 U.S. 957, 113 S.Ct. 417, 121 L.Ed.2d 340 (1992). See also Brooks v.State, 695 So.2d 176 (Ala.Cr.App. 1996), aff'd, 695 So.2d 184 (Ala.), cert. denied, 522 U.S. 893, 118 S.Ct. 233, 139 L.Ed.2d 164 (1997).
 "`"In the absence of plain error . . . it is not our place as an appellate court to second guess the litigants before us and grant them relief they did not request, pursuant to legal theories they did not outline, based on facts they did not relate." Adler v. Duval County School Bd., 112 F.3d 1475, 1481 n. 12 (11th Cir. 1997). Because the contemporaneous objection rule is essential to the integrity and efficiency of our judicial process, we have stressed that "the plain error test is difficult to meet." United States v. King, 73 F.3d 1564, 1572 (11th Cir. 1996); accord, e.g., United States v. Sorondo, 845 F.2d at 948-49; United States v. Chaney, 662 F.2d 1148, 1152 n. 4 (5th Cir. Unit B 1981).'"
 "United States v. Pielago, 135 F.3d 703, 709 (11th Cir. 1998)."
Thomas v. State, 824 So.2d 1, 14 (Ala.Cr.App. 1999).
In its supplemental instruction, the trial court charged the jury that if it could not reach a verdict, a mistrial would be declared and the case would have to be tried again. Although in the event that the jury could not reach a sentencing recommendation only the sentencing phase of the trial would have to be retried, in a real sense, because the State, as well as the defense, *Page 367 
would have to present all of the evidence from the guilt phase to a new sentencing jury, the guilt phase, for all intents and purposes, must also be retried. Although the new sentencing jury would not render a verdict as to Maxwell's guilt, the time and expense of presenting the guilt phase again would be essentially the same.
We cannot conclude that the trial court's statement that the case would have to be retried if the jury did not reach a sentencing verdict, in the context of the entire supplemental instruction, had such an unfair prejudicial impact on the jury's deliberations as to call into question the fairness and integrity of the sentencing proceedings. As we stated above, the charge in no way suggested to the jury that it had to return a verdict of death and the charge was not coercive or threatening. Moreover, Maxwell's failure to object to the charge suggests that Maxwell himself did not believe that the charge was misleading or prejudicial at the time it was given. Maxwell could have objected to the charge and given the trial court the opportunity to clarify for the jury its statement about a retrial, but he failed to do so. "The plain error rule "`is less likely to be applied where the error could have been readily corrected by an objection at trial. . . .'" Thomas, 824 So.2d at 15, quoting Wayne R. LaFave Jerold H. Israel, Criminal Procedure § 27.5(d), p. 1160 (2d ed. 1992).
We are simply not persuaded by Maxwell's argument that the trial court's failure to specifically instruct the jury that only the sentencing phase of the trial would have to be retried in the event that the jury was unable to reach a sentencing verdict requires us to remand the case for a new sentencing hearing. We hold that the trial court's supplemental instruction simply does not rise to the level of "plain error" that would justify a reversal of Maxwell's sentence.
 VII.
In accordance with Rule 45A, Ala.R.App.P., we have examined the record for any plain error with respect to Maxwell's capital murder convictions and death sentence, whether or not brought to our attention or to the attention of the trial court. We find no plain error or defect in the proceedings, either in the guilt phase or in the sentencing phase of the trial.
We have also reviewed Maxwell's sentence in accordance with §13A-5-51, Ala. Code 1975, which requires that, in addition to reviewing the case for any error involving Maxwell's capital murder convictions, we shall also review the propriety of the death sentence. This review shall include our determination of the following: (1) whether any error adversely affecting the rights of the defendant occurred in the sentence proceedings; (2) whether the trial court's findings concerning the aggravating and mitigating circumstances were supported by the evidence; and (3) whether death is the appropriate sentence in the case. Section13A-5-53(b) requires that, in determining whether death is the proper sentence, we determine: (1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; (2) whether an independent weighing by this court of the aggravating and mitigating circumstances indicates that death is the proper sentence; and (3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
After the jury convicted Maxwell of the capital offenses charged in the indictment, a separate sentence hearing was held before the jury in accordance with §§ 13A-5-45 and -46, Ala. Code 1975. After hearing *Page 368 
evidence concerning aggravating and mitigating circumstances, after being properly instructed by the trial court as to the applicable law, and after being correctly advised as to its function in finding any aggravating and mitigating circumstances, the weighing of those circumstances, if appropriate, and its responsibility in reference to the return of an advisory verdict, the jury recommended by a vote of 10-2 that Maxwell be sentenced to death by electrocution.
Thereafter, the trial court held another hearing, in accordance with § 13A-5-47, Ala. Code 1975, to aid it in determining whether it would sentence Maxwell to life imprisonment without parole or to death, as recommended by the jury. The trial court ordered and received a written presentence investigation report, as required by § 13A-5-47(b). Upon conclusion of the hearing, the trial court entered specific written findings concerning each aggravating circumstance enumerated in §13A-5-49, Ala. Code 1975, each mitigating circumstance enumerated in § 13A-5-51, Ala. Code 1975, and any mitigating circumstance found to exist under § 13A-5-52, Ala. Code 1975, as well as written findings of fact summarizing the offense and Maxwell's participation in the offense.
In its findings of fact, the trial court found the existence of one statutory aggravating circumstance: that the murders were committed while Maxwell was engaged in the commission of a robbery, see §13A-5-49(4), Ala. Code 1975. The trial court found the existence of one statutory mitigating circumstance: that Maxwell had no significant history of prior criminal activity, see § 13A-5-51(1), Ala. Code 1975. The trial court also heard testimony regarding Maxwell's character or record and any of the circumstances of the offense that Maxwell offered as a basis for sentencing him to life imprisonment without parole instead of death, see § 13A-5-52, Ala. Code 1975. In this regard, the trial court found that the following evidence was mitigating: that Maxwell surrendered to the authorities and that he confessed his involvement in the murders (although, as the trial court noted in its sentencing order, he did not do so immediately after the murders but instead waited until one month after the murders).
The trial court's sentencing order reflects that after considering all the evidence presented, the presentence report, and the advisory verdict of the jury and after weighing the aggravating circumstance against the statutory and nonstatutory mitigating circumstances in the case, the trial court found that the aggravating circumstance outweighed the statutory and nonstatutory mitigating circumstances. Accordingly, the trial court sentenced Maxwell to death. The trial court's findings concerning the aggravating circumstances and the mitigating circumstances are supported by the evidence.
Maxwell was convicted of the offenses of murder committed during a robbery, murder of two or more persons by one act or pursuant to one scheme or course of conduct, and the murder of a child less than 14 years of age. These offenses are defined by statute as capital offenses. See § 13A-5-40(2), (10), and (15), Ala. Code 1975. We take judicial notice that similar crimes have been punished capitally throughout the state. See, e.g., cases dealing with murders committed during a robbery: Burgess v. State, 811 So.2d 557 (Ala.Cr.App. 1998); Clemons v.State, 720 So.2d 961 (Ala.Cr.App. 1996), aff'd, 720 So.2d 985 (Ala. 1998), cert. denied, 525 U.S. 1124, 119 S.Ct. 907, 142 L.Ed.2d 906
(1999); Williams v. State, 710 So.2d 1276 (Ala.Cr.App. 1996), aff'd,710 So.2d 1350 (Ala. 1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325,141 L.Ed.2d 699 (1998); *Page 369 Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App. 1990), aff'd, 577 So.2d 531
(Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197
(1991); Brownlee v. State, 545 So.2d 151 (Ala.Cr.App. 1988), aff'd,545 So.2d 166 (Ala.), cert. denied, 493 U.S. 874, 110 S.Ct. 208,107 L.Ed.2d 161 (1989); Hallford v. State, 548 So.2d 526 (Ala.Cr.App. 1988), aff'd, 548 So.2d 547 (Ala.), cert. denied, 493 U.S. 945, 110 S.Ct. 354,107 L.Ed.2d 342 (1989); Davis v. State, 536 So.2d 110 (Ala.Cr.App. 1987), aff'd, 536 So.2d 118 (Ala. 1988), cert. denied, 490 U.S. 1028,109 S.Ct. 1766, 104 L.Ed.2d 201 (1989); cases dealing with the murder of two or more persons: Freeman v. State, 776 So.2d 160 (Ala.Cr.App. 1999);Pilley v. State, 789 So.2d 870 (Ala.Cr.App. 1998); Burgess v. State,723 So.2d 742 (Ala.Cr.App. 1997), aff'd, 723 So.2d 770 (Ala. 1998), cert. denied, ,526 U.S. 1052, 119 S.Ct. 1360, 143 L.Ed.2d 521
(1999); Taylor v. State, 666 So.2d 36 (Ala.Cr.App. 1994), aff'd,666 So.2d 73 (Ala. 1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928,133 L.Ed.2d 856 (1996); Siebert v. State, 555 So.2d 772 (Ala.Cr.App.), aff'd, 555 So.2d 780 (Ala. 1989), cert. denied, 497 U.S. 1032,110 S.Ct. 3297, 111 L.Ed.2d 806 (1990); Fortenberry v. State, 545 So.2d 129
(Ala.Cr.App. 1988), aff'd, 545 So.2d 145 (Ala. 1989), cert. denied,495 U.S. 911, 110 S.Ct. 1937, 109 L.Ed.2d 300 (1990); Hill v. State,455 So.2d 930 (Ala.Cr.App.), aff'd, 455 So.2d 938 (Ala.), cert. denied,469 U.S. 1098, 105 S.Ct. 607, 83 L.Ed.2d 716 (1984); and cases dealing with the murder of a child under fourteen years of age: Ward v. State,814 So.2d 899 (Ala.Cr.App. 2000); Minor v. State, 780 So.2d 707
(Ala.Cr.App. 1999); Dunaway v. State, 746 So.2d 1021 (Ala.Cr.App. 1998).
After carefully reviewing the record of the guilt phase and the sentencing phase of Maxwell's trial, we find no evidence that the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor. We conclude that the findings and the conclusions of the trial court are amply supported by the evidence. We have independently weighed the aggravating circumstance against the statutory and nonstatutory mitigating circumstances, and we concur in the trial court's judgment that the aggravating circumstance outweighs the mitigating circumstances, and that death is the appropriate sentence in this case. Considering Maxwell and the crime he committed, we find that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases.
For the reasons stated above, Maxwell's convictions and sentence of death are affirmed.
AFFIRMED.
McMillan, Cobb, Baschab, and Fry, JJ., concur.